[Civ. No. 21182. First Dist., Div. Two. Dec. 17, 1963.]

MILDRED D. MUNDT, Plaintiff and Respondent, v. ALTA BATES HOSPITAL et al., Defendants and Appellants.

Hardin, Fletcher, Cook & Hayes, Cyril Viadro, Lamb, Hoge & Glynn, Peart, Baraty & Hassard and Alan L. Bonnington for Defendants and Appellants.

Jack H. Werchick for Plaintiff and Respondent.

SHOEMAKER, P. J.—Plaintiff Mildred Mundt brought this action to recover damages for personal injuries allegedly caused by the malpractice of defendants Dr. Sheldon Margen, Dr. Rubin Lewis, Dr. Paul Schneider, and Alta Bates Hospital. The complaint, as modified by the pretrial conference order, alleged that plaintiff, while a patient at Alta Bates Hospital on April 3, 1959, underwent certain operative procedures; that each of the defendants, with the exception of defendant Schneider, thereafter negligently injured plaintiff by allowing a solution of dextrose and potassium chloride to infiltrate into the tissue of her leg; that defendant Schneider thereafter aggravated plaintiff's injury by his negligence in performing plastic surgery upon her.

The case was tried before a jury. All defendants moved for a nonsuit, and the motions of defendants Schneider and Lewis were granted. Upon the conclusion of the trial, the jury returned a verdict in favor of the two remaining defendants, and judgment was accordingly entered.

Plaintiff thereafter moved for a new trial against defendants Lewis, Margen, and Alta Bates Hospital. The court set aside the judgment of nonsuit in favor of Lewis and granted plaintiff a new trial against this defendant on the ground that the granting of the nonsuit was the result of error of law. The court also granted plaintiff a new trial against Margen and Alta Bates Hospital on the ground of the insufficiency of the evidence to justify the verdict. Defendants appeal from the order granting plaintiff a new trial.

Appellants Margen and Lewis first contend that the order granting a new trial must be reversed because respondent failed to serve Dr. Schneider with a notice of intention to move for a new trial. Appellants insist that Code of Civil Procedure, section 659, makes it mandatory that a notice of intention be served upon the adverse party, and that Dr. Schneider is such a party. Cases construing the section have held that the term ''adverse party'' includes every party who will be adversely affected by the granting of the motion (*Spruce* v. *Wellman* (1950) 98 Cal.App.2d 158, 160 [219 P.2d 472]), and that in the absence of the service so required, the court lacks jurisdiction to grant a new trial upon any issue affecting his interest. (*Caruthers Building Co.* v. *Johnson* (1916) 174 Cal. 20, 24 [161 P.985] ; *Spruce* v. *Wellman, supra*, at p. 160.)

However, respondent did not seek a new trial against Dr. Schneider, and the judgment of nonsuit in his favor

stands. Under such circumstances, the granting of a new trial against his codefendants could have no adverse effect upon Dr. Schneider's interests and respondent was therefore under no obligation to serve him with the notice of motion. (See *Dearing* v. *Fessler* (1949) 94 Cal.App.2d 260, 261 [210 P.2d 535].) ■ Appellants seek to avoid this result by urging that a retrial against Dr. Schneider's three codefendants might well result in a judgment holding one or more of them liable for the full amount of respondent's damages, based upon the rule that if the injured party exercises due care in the selection of a doctor and his injuries are aggravated by the negligence of such doctor, the original wrongdoer may be held liable for such aggravation. (Rest., Torts, § 457; *Ash* v. *Mortensen* (1944) 24 Cal.2d 654, 657 [150 P.2d 876].) Appellants thereupon reason that since it is possible that a portion of the damages for which they could be held liable upon a retrial might in fact be attributable to the negligent medical treatment subsequently furnished respondent by Dr. Schneider, and that such a recovery would then give them a cause of action against Dr. Schneider to obtain indemnity or reimbursement for that portion of the damages caused by his negligence, it necessarily follows that Dr. Schneider must be deemed an adverse party whom respondent was required to serve with notice of her motion for new trial.

This argument, while ingenious, is untenable. In the event that Dr. Schneider's codefendants should, upon retrial, be found liable to respondent for both the injury directly caused by them and any aggravation resulting from negligent medical treatment subsequently furnished by Dr. Schneider, there is no conceivable basis upon which indemnity or reimbursement could be obtained from Dr. Schneider. Since respondent did not seek or obtain a retrial against Dr. Schneider and since the judgment of nonsuit in his favor operates as an adjudication on the merits (Code Civ. Proc., § 581c; *Fairfield* v. *Ahlstrom* (1962) 206 Cal.App.2d 590, 593 [24 Cal.Rptr. 70]; *Grable* v. *Martin* (1961) 193 Cal.App.2d 241, 242 [14 Cal.Rptr. 275]), there is no possible way in which respondent could obtain a money judgment jointly against Dr. Schneider and his codefendants. It follows that the codefendants, if found liable upon retrial, would have no right to seek contribution from Dr. Schneider pursuant to Code of Civil Procedure, section 875. (*American Can Co.* v. *City & County of San Francisco* (1962) 202 Cal.App.2d 520, 523 [21 Cal.Rptr. 33].) ■ There is similarly no basis upon which

Dr. Schneider could be required to indemnify them against that portion of the damages assessed against them which was attributable to his negligence. Dr. Schneider's codefendants could be held liable for any aggravation negligently caused by his treatment only if such aggravation were found to have been proximately caused by their original tortious conduct. (*Ash* v. *Mortensen, supra,* at p. 657.) ■ It is settled that, in the absence of certain contract or equitable considerations not here present, there is no right to indemnity between wrongdoers whose concurring negligence results in injury to a third party. (*American Can Co.* v. *City & County of San Francisco, supra,* at pp. 524-526; *Pierce* v. *Turner* (1962) 205 Cal.App.2d 264, 267-269 [23 Cal.Rptr. 115].) ■ The granting of a new trial against Dr. Schneider's codefendants could not affect his interests adversely, hence respondent's failure to serve him with notice of the motion did not deprive the trial court of jurisdiction to grant the new trial. (*Dearing* v. *Fessler, supra,* at p. 261.)

The second and final contention raised by each of the three appellants is that the evidence was insufficient as a matter of law to support a judgment against them and that the order granting a new trial must therefore be reversed.

■ The record shows that respondent, a woman 39 years of age, had suffered for many years from a progressive and incurable disease of unknown cause, characterized by an inflammatory reaction occurring in the tissue and vascular systems of the body. In 1954, Margen, a specialist in internal medicine, assumed charge of respondent's care and treatment. Part of the treatment which he administered to her during flareups of the disease consisted of intravenous or intramuscular injections of ACTH.

In March 1959, respondent suffered a particularly severe flareup. When she failed to respond to subcutaneous and intramuscular injections of ACTH, Margen concluded that it would be necessary to hospitalize her in order that he could undertake an intravenous infusion of ACTH over a continuous 48-hour period. On April 3, 1959, respondent was admitted to the Alta Bates Hospital and intravenous infusion was unsuccessfully attempted by him.

By the following day, April 4, 1959, Margen had determined that it would be necessary to perform a "cut-down," an operative procedure whereby an incision is made over a vein and a tube or catheter is then inserted directly into the vein. Margen called in Lewis, a specialist in surgery, to per-

form the "cut-down," which was commenced at 7:30 p.m. on the same day. Lewis determined that the most suitable site for the operation was the inner side of respondent's lower right leg, just above the ankle, and Lewis made an incision at this site, introduced the catheter into the vein, and gently pushed the catheter up the vein some 10 or 12 inches. When the intravenous fluid began to flow into the catheter, respondent complained of pain and Margen and Lewis observed a slight bulging at the point where they judged the tip of the catheter to be. Upon concluding that the catheter had penetrated the vein wall and that intravenous fluid was escaping into the surrounding tissue, Lewis withdrew the catheter approximately an inch and a half to 2 inches and applied pressure to the area over the vein. The intravenous fluid then began to flow normally into the vein. They continued to observe the site for an additional 20 or 30 minutes. When there was no increase in swelling and the intravenous fluid continued to flow freely, Lewis concluded that the infusion had been successfully accomplished.

Since respondent did not call an independent expert witness, the medical testimony bearing upon the propriety of the procedure thus far described consisted solely of that elicited from Lewis and Margen under Code of Civil Procedure, section 2055. Lewis testified that he had inserted the catheter into the vein in a manner entirely consistent with good medical technique, applying a minimal amount of pressure. He stated that it was extremely unusual for a vein to be punctured by a catheter and that he could offer no explanation for this occurrence. Once having realized that the vein had been penetrated, however, he was confronted with the choice of removing the catheter and undertaking a second "cut-down" on another area of respondent's body, or allowing the catheter to remain in place despite the fact that a certain degree of infiltration was taking place. Upon partially withdrawing the catheter and observing that the intravenous fluid was flowing normally and that there was no increase in swelling, he concluded that the best and safest course would be to leave the catheter in place. In arriving at this decision, he had in mind that there was virtually no other site where a second "cut-down" could be performed, that the intravenous fluid to be administered was noncorrosive and could safely be injected under the skin, and that the hole in the vein appeared to be a small one which had closed itself after the catheter was partially withdrawn.

Margen testified that infiltration around veins was an extremely common occurrence in connection with intravenous infusions and that there was no danger to the patient unless a large amount of fluid escaped from the vein. He stated that it was not uncommon for a catheter to be pushed through the vein wall during an intravenous infusion and that good medical practice did not require that the catheter then be removed to another site. He also confirmed the fact that the fluid to be given respondent was a noncorrosive substance which could safely be introduced beneath the skin. He stated that there was almost invariably some infiltration around a ''cut-down'' and that a small infiltration was not dangerous to the patient because the fluid would merely be absorbed by the surrounding tissues.

Following the completion of the ''cut-down'' procedure, Lewis' connection with the case terminated, and respondent was left under the care of Margen and the nurses employed by appellant Alta Bates Hospital. Margen ordered the nurses to administer to respondent a solution consisting of glucose, water, potassium chloride, and ACTH, at the rate of 1000 c.c.'s per 12 hours. In addition to regulating the rate of flow into the catheter, it was also the duty of the nurses to observe the area of the ''cut-down'' for swelling, redness, or other signs that the intravenous infusion was not running properly.

The nurses attending respondent during the period following the ''cut-down'' noted nothing unusual, and by 6:40 a.m. on April 5, the first 1000 c.c.'s of intravenous solution had been fully absorbed and a new bottle of solution was started.

Nurse Griffin came on duty at 7 a.m. on April 5. At 8:20 a.m. she observed the area of the ''cut-down'' and concluded that the solution was not running properly and that infiltration was occurring. She wrote ''Calf edematous and firm'' on respondent's chart. At 10:30 a.m. Margen visited respondent and examined the ''cut-down'' area. Although he read Nurse Griffin's chart notation, his own observation of respondent's leg indicated no more infiltration than could be expected from a normal ''cut-down'' reaction. He gave no order that the intravenous infusions be discontinued. By 3 p.m. Nurse Griffin observed that the intravenous solution was running extremely slowly and asked the charge nurse, Miss Terazawa, to observe respondent's leg. A call was then made to Margen and Nurse Griffin informed him of her observa-

tions. Margen inquired whether there was any great change in the leg since morning, and she replied that there was not. He then instructed her to continue the intravenous infusions. At this time, the change of nurses took place and Nurse Jones again came on duty. By 4:30 p.m. she concluded that the infusion was not going properly and noted on respondent's chart "leg firm and edematous." At 10 p.m. she charted "Right leg edematous and slightly red on inner calf." She also reported this observation to the charge nurse, but appellant Margen was not called.

At 11 p.m. on April 5, Nurse Mello came on duty and was informed that respondent was suffering from edema of the leg, but that Margen had ordered the infusions to continue nevertheless. At 11:30 or 12 o'clock, Nurse Mello noted on respondent's chart "Right leg on pillows—appears edematous." She testified that at the time of this notation, respondent's right leg was noticeably larger than her left. The condition of respondent's right leg became worse toward morning and at 5:40 a.m. on April 6, Nurse Mello charted "leg appears more edematous." At 6:20 a.m. she asked the charge nurse to observe the leg, and at 6:55 a.m. was instructed to call Margen. The testimony relative to this conversation was conflicting in that Nurse Mello stated that she informed him that there was "increasing edema," whereas he testified that he was told only that respondent's leg was "still edematous." In any event, Margen instructed Nurse Mello to continue the intravenous infusions.

At 7 a.m., Charge Nurse Terazawa came on duty, and, upon examining respondent's leg, concluded that it had undergone a marked change for the worse since she had last examined it at 3 p.m. on April 5. By 8:30 a.m. the swelling in respondent's leg had extended to the area above the knee and the intravenous fluid was running very slowly. At 10 a.m. Nurse Terazawa called Margen's office and was able to contact his partner, Dr. Leon Lewis. Upon being informed of the condition of respondent's leg, Dr. Lewis came to the hospital at 11 a.m. and removed the "cut-down" [sic] (undoubtedly refers to catheter). By this time respondent's right leg was swollen to approximately twice its normal size. As a result of this massive infiltration, respondent suffered "necrosis" or death of certain tissues in her leg.

The expert testimony relative to the sequence of events occuring subsequent to the "cut-down" procedure may be summarized as follows: Margen testified that the injury to

respondent's leg would not have occurred if the "cut-down" had been properly performed and if respondent had been carefully observed during the period following the "cut-down" in a manner consistent with the standard of care generally possessed and exercised by reputable physicians in the community. He also testified that a nurse who observes swelling or redness at the site of a "cut-down" is under a duty to either notify the physician in charge of the case or turn off the intravenous fluid. He stated that respondent's injury would not have occurred if the intravenous solution had been turned off when the swelling of her leg had reached a critical point. In his opinion, respondent's injury was the result of the failure of the hospital nurses to perform their duties in a manner consistent with the standard of care ordinarily exercised by nurses of good standing in the community. He also testified, however, that only a trained physician possessed the professional judgment necessary to determine whether the good to be derived from a given medication is offset by the degree of infiltration which he observes to be occurring.

The testimony of the Alta Bates nurses relative to the standard of care generally exercised by reputable nurses in the community was to the effect that a nurse who observes swelling or other danger signs in the area of a "cut-down" is under a duty to notify the doctor in charge but that she may only cut off the flow of intravenous solution upon orders from the doctor.

This evidence supports the contention of appellant Lewis that the evidence was insufficient as a matter of law to support a judgment against him. In *Siverson* v. *Weber* (1962) 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97], the plaintiff developed a fistula, or a hole in the wall of the bladder and vagina, following a hysterectomy. The medical witnesses testified that they were unable to ascertain the exact cause of the fistula, but that a fistula, although rare, is an inherent risk of such an operation and may occur even though the surgeon has exercised the care and skill generally possessed and exercised by reputable gynecologists in the community. In upholding a judgment of nonsuit in favor of the doctor who assisted in the performance of the hysterectomy, the court pointed out that neither the cause of the fistula nor the question whether it was probably the result of negligence was a matter of common knowledge among laymen. Since none of the medical witnesses testified that the operation was per-

formed in a manner contrary to good medical practice or that those rare cases in which fistulas occur are more probably than not the result of negligence, there was no evidence to support a judgment against the defendant. Although plaintiff-appellant contended that she was entitled to the benefit of the inference of negligence arising from the doctrine of res ipsa loquitur, the court rejected this argument, stating: ''To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible.'' (P. 839.) Lewis' connection with this case began and ended with the performance of the ''cut-down.'' Although it is true that the vein wall was punctured by the catheter during the course of this operative procedure, it is apparent that neither the cause of the puncture nor the question whether it was probably the result of negligence was a matter of common knowledge among laymen. The record contains no medical testimony that the ''cut-down'' was performed in a manner contrary to good medical practice. Although Lewis did state that it was unusual for a vein to be punctured by a catheter, he also stated that he had inserted the catheter into the vein in an entirely proper manner and that he was at a loss to explain the cause of the puncture. There was no medical testimony that the occurrence of the puncture was more probably than not the result of negligence. There was similarly no medical testimony that the decision to leave the catheter in place despite the puncture in the vein was contrary to good medical practice. Indeed, Margen specifically stated that good medical practice did not require removal to a new site upon the occurrence of a puncture.

Since the record does not contain evidence indicating that Lewis was negligent, and, under the holding of the *Siverson* case, *supra*, the doctrine of res ipsa loquitur is not applicable, we are convinced that the evidence was insufficient as a matter of law to support a judgment against appellant Lewis, and the order granting respondent a new trial against him

must be reversed. (*Brown* v. *Reliable Iron Foundry, Inc.* (1959) 174 Cal.App.2d 294, 298 [344 P.2d 633].)

■ The sole question remaining is whether the evidence was sufficient to support a judgment against Margen or Alta Bates Hospital. The evidence requires an affirmative answer as to both appellants.

The record discloses ample medical testimony that respondent's injury would not have occurred if the condition of her leg had been carefully observed during the period following the ''cut-down'' and if the intravenous fluid had been stopped when the leg became dangerously swollen. There was also uncontradicted testimony that the condition of respondent's leg underwent a marked change between 3 p.m. on April 5, and 7 a.m. on April 6, but that the ''cut-down'' was not removed until 11 a.m. on April 6. In the face of such testimony, there was clearly ample evidence upon which the trier of fact could find that Margen, the hospital nurses, or both, were negligent in their duties.

Although the nurses testified that the condition of respondent's leg grew increasingly worse during the afternoon and evening of April 5, no attempt to contact Margen was made until 6:55 on the morning of April 6. At that time, according to the testimony of Margen, Nurse Mello informed him only that the leg was ''still edematous.'' This evidence was clearly sufficient to support a finding that the hospital nurses were derelict in their duty to observe the condition of respondent's leg and promptly report all unfavorable symptoms to the doctor in charge. On the other hand, the trier of fact could have believed Nurse Mello's testimony that she did inform Margen of ''increasing edema.'' This testimony would have justified a finding that he was negligent in failing either to order the intravenous infusions discontinued or to come to the hospital and ascertain for himself whether respondent's health would be endangered by continuing the infusions. As yet a third possibility, the trier of fact might conclude that respondent's injury was the result of the combined negligence of Margen and the hospital nurses. It must be recalled that Margen testified that only a trained physician was qualified to determine whether the good to be derived from a given intravenous medication was offset by the degree of infiltration which he observed to be occurring. On such a record, the trier of fact would be entitled to conclude that even if the nurses were negligent in their duty to observe and report accurately, Margen was also negligent in

failing to examine respondent's leg himself more frequently and in choosing to rely, for long periods of time, solely upon the information provided by the nurses.

The order granting respondent a new trial against appellant Lewis is reversed, and the order granting respondent a new trial against appellants Margen and Alta Bates Hospital is affirmed.

Agee, J., and Taylor, J., concurred.