[Civ. No. 23114. First Dist., Div. Three. Feb. 8, 1968.]

ARTHUR R. BELSHAW, Plaintiff and Respondent, v. BERTRAM FEINSTEIN et al., Defendants and Appellants.

Peart, Baraty & Hassard, Peart, Hassard, Smith & Bonnington, George A. Smith and John I. Jefsen for Defendants and Appellants.

Boccardo, Blum, Lull, Niland, Teerlink & Bell and Edward J. Niland for Plaintiff and Respondent.

BRAY, J.*—Defendants in a medical malpractice action appeal from judgment, after jury verdict, in favor of plaintiff in the sum of $155,000.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

QUESTIONS PRESENTED

1. The conditional res ipsa loquitur instruction needed to be given.

2. Absent the doctrine of res ipsa loquitur, there was evidence of negligence.

3. Defendants did not waive their rights to question the giving of the res ipsa loquitur instruction.

4. The action is not barred by the written release signed by plaintiff.

RECORD

Dr. Bertram Feinstein and Dr. Grant Levin are physicians and surgeons practicing in San Francisco and specializing in neurosurgery. Each is one of very few surgeons in the West qualified to perform a specialized type of neurosurgery known as stereotaxic surgery. Both have had extensive training in this field and are recognized as authorities on the subject. These doctors operated the only stereotaxic center in San Francisco with the possible exception of one at the University of California.

In 1960 plaintiff, then 56 years old, noticed that his right hand would intermittently involuntarily quiver. He consulted his family physician; Dr. Romito, several times beginning in December 1960. In April 1961 Dr. Romito diagnosed plaintiff's condition as Parkinson's disease and treated him accordingly. Plaintiff did not respond to the treatment and on September 8 Dr. Romito referred him to another neurologist, Dr. Stanley Skillicorn, who positively diagnosed Parkinson's disease. This is a progressive, degenerative disorder of the central nervous system, that is, a portion of the brain, characterized by disturbances of ability to move one or both sides, by disturbances in gait, and by tremor. It is essentially an involvement of the extraparametal tract or basal ganglia section of the brain, which may result in involuntary movements of various kinds. The great majority of persons afflicted with the disease follow a fairly predictable pattern, in that, in due time they will progress to a condition of considerable and eventual total disability. There is no true cure for the disease.

On March 14, 1962, Dr. Feinstein examined plaintiff and agreed with the Parkinson's disease diagnosis. He further noted that plaintiff possibly suffered from arteriosclerosis (hardening of the arteries). He stated that plaintiff appeared to be a good candidate for stereotaxic surgery and that such

surgery had been effective in arresting certain symptoms of the disease and bringing about some improvement in approximately 80 percent of the cases; that there is a normal calculated risk of mortality and complications of about 1 percent in this type of case. Dr. Feinstein described to plaintiff the necessary two-stage operation procedure, and plaintiff decided to have the surgery done.

Plaintiff was admitted to Mt. Zion Hospital on April 22, 1962. After various tests and examinations were had on April 25, the first stage of the operational procedure was uneventfully completed by Dr. Feinstein; and, in due time, plaintiff was discharged from the hospital.

On July 25 plaintiff underwent the second stage of the operative process. It was during this second stage of the procedure that plaintiff received the injuries which led to the bringing of this action. The procedures and the injuries will be hereinafter discussed. The jury awarded plaintiff $155,000.

## The Operations

Before discussing the doctrine of res ipsa loquitur, we will first describe the surgery and its results. As stated, a stereotaxic operation is a two-stage operative procedure utilizing special instruments, equipment and technique. During the course of the first stage, the inner square frame of a stereotaxic frame is affixed to the skull of the patient with three small inserts and skull screws. This enables the surgeon to remove the frame and later, during the second stage, accurately replace the frame in the same relative position on the patient's skull. The inner square frame of the stereotaxic instrument is calibrated upon three different planes. X-rays are taken of the patient's skull while the inner square frame is attached thereto. Through the use of the X-rays thus derived, the surgeon is able to locate his particular target with reference to all three dimensions and accurately chart the course that he will follow in reaching the selected area.

During the first stage, a trephine opening is made in the skull of the patient. A trephine is a circular cutting instrument used for penetrating the bone of the skull. In the instant case a d'Errico trephine with a 2-inch circumference was used. This instrument is applied to the patient's skull and then the circular blade is turned (with a tool similar to the carpenter's brace and bit), making an incision in the skull bone of the patient with the *intent of cutting nearly through the skull bone leaving only a thin remaining shelf*. During the course

of the first stage, the button of bone thus made is not removed from the patient's skull but left in place until the performance of the second stage of the stereotaxic procedure. All of the first stage is performed while the patient is under a general anesthetic. After taking X-rays and incising a button of skull bone, the crevices in the skull are filled in with bone wax and gelfilm and the patient is released from the hospital to return home.

After a period of not less than six weeks' convalescence the patient returns to the hospital for the performance of the second stage of the operation. The second stage of the two-step stereotaxic operative procedure is done under a local anesthetic. The inner square frame of the stereotaxic instrument is reaffixed to the skull of the patient using the prior small inserts to insure that the frame is accurately re-affixed in the same position that it was during the course of the first stage. The trephine instrument is then reapplied to the patient's skull and utilized to sever the fibrous tissue which has since grown in the crevice of bone and the remaining bone which was left after the incision of the first stage of the operation. The trephine is then tilted, breaking any slight remaining shelf of bone and the button of bone is lifted out. An electrode is then attached to the inner square frame of the stereotaxic instrument and set in a precise position in accordance with the prior calculations derived from the previously taken X-rays. This electrode is then introduced through the opening in the skull into the brain tissue of the patient to the target area the physician desires to inactivate. Through a testing procedure which entails the coordination of a considerable number of people: surgeon, anesthesiologist, electronic engineers, biophysicists, psychologists and assistant surgical personnel; the precise area is entered with the electrode and inactivated by causing a lesion due to heat. During this phase of the operation the patient is carefully and continuously monitored in order to see the degree of improvement and observe if anything untoward is happening.

On the morning of July 25, 1962, plaintiff was given a local anesthetic and then prepared for the removal of the button of bone. Dr. Feinstein had not recorded the setting of the trephine used in the first stage of the operation so he had to reset the trephine for the second stage. To make this setting Dr. Feinstein referred to the specialized X-rays of plaintiff's skull. The trephine was then applied to plaintiff's skull and used to sever the fibrous tissue growth in the crevice and the remain-

ing shelf of bone left in the prior operation. The bone flap was then tilted and a large gush of blood was noted on the medial side of the incision. Almost immediately thereafter arterial bleeding was also noted. Immediate steps were undertaken to control the bleeding. It appeared as if the dura, pia, and part of the cortex had been cut. There was great difficulty in controlling the bleeding due to the vessels being weakened by arteriosclerosis. Dr. Feinstein called for, and was then joined by, Dr. Levin. A transfusion was commenced. Due to the diseased arteriosclerotic condition of plaintiff's blood vessels, radical steps were necessary to adequately control the bleeding and insure the safety of plaintiff's life. After exerting all conservative measures and, in view of plaintiff's deteriorating condition, Dr. Levin and an assistant "prepped" plaintiff's neck and exposed the common carotid artery. By the use of a sling and then a Selverstone clamp the flow of blood through this artery was constricted and the bleeding was controlled. The clots which had developed in the brain cavity were cleaned by Dr. Feinstein and the cavity was lined with gelusil. The dura was closed in part, a piece of gelfilm was placed over the flap, and the skin was closed. A head dressing was applied and plaintiff was sent to the intensive care unit of the hospital. It was determined during the bleeding crisis that plaintiff had suffered a hemiparesis or severe weakness on one side of his body—an effect similar to a stroke.

Plaintiff is presently a hemiparetic with severe weakness on the right side. His present condition is permanent and irreversible. In his deposition and at the trial, Dr. Feinstein attempted to repudiate his own postoperative report in which he stated that the trephine had cut the dura, the pia and the cortex. He testified that he now did not know whether it was the trephine that cut the dura or whether the dura had adhered to the bone and had torn when he tried to lift the bone out. It was difficult to say which had happened, and he couldn't tell the jury for sure. It was a "possibility" that the brain was cut with the trephine. At the time he dictated his report he didn't think of the other possibility. He admitted, however, that it was clear to him at that time that the brain had been cut by the trephine.

Dr. Levin testified that after the operation he informed Mrs. Belshaw, plaintiff's wife, that complications had transpired during the course of the second-stage operation and analogized it to be similar to a stroke. Dr. Levin further testified that it would have been false to tell Mrs. Belshaw that her hus-

band had suffered a stroke because a stroke technically results from natural causes and not from the type of accident which occurred during the operation. Mrs. Belshaw, however, testified that she was told that her husband had suffered a stroke, and that the first time she knew that her husband's injury had resulted from a cut during the operation was when she heard it in court. Doctor Feinstein testified that he told Mrs. Belshaw that her husband had had a hemorrhage during surgery. He did not believe that he ever told her that it occurred during a trephination, nor did he ever tell the Belshaws that a surgical instrument had lacerated or cut plaintiff's brain.

Dr. Feinstein testified that before the operation on plaintiff he and Dr. Levin had performed over 900 stereotaxic procedures. In only two instances was the patient's brain cut at a comparable stage of the proceedings.

1. The Res Ipsa Loquitur Instruction.

The trial court gave a conditional instruction on res ipsa loquitur.[1] No criticism is made of the *form* of the instruction.

A physician's duty is to exercise that degree of care and skill ordinarily possessed and exercised by members of his profession under similar circumstances. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757].)

[1] "One of the questions for you to decide in this case is whether the injury involved occurred under the following conditions: First, that it is the kind of injury which ordinarily does not occur in the absence of someone's negligence; and, second, that it was caused by an agency or instrumentality in the exclusive control of the defendants. If, and only in the event that you should find both of these conditions to exist, you are instructed as follows: From the happening of the accident involved in this case, an inference arises that a proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference is a form of evidence and, unless there is contrary evidence sufficient to meet or balance it, the jury should find in accordance with the inference. When there is any evidence to the contrary, you must weigh all of the evidence bearing upon the issue of defendant's negligence. If the evidence tending to prove that the accident was caused by a failure of the defendant to exercise the care required of him has greater weight than the evidence to the contrary, you will find in favor of the plaintiff on that issue. In order to meet or balance the inference of negligence, the defendant must present evidence to show either, one, a satisfactory explanation of the accident, that is, a definite cause for the accident, in which there is no negligence on the part of the defendants, or, two, such care on the defendants' part as leads to the conclusion that the accident did not happen because of want of care by them, but was due to some other cause, although the exact cause may be unknown. If such evidence has at least as much convincing force as the inference and other evidence, if any, supporting the inference, then you will find against the plaintiff on that issue. This is what is known as the doctrine of res ipsa loquitur. Now, the doctrine of res ipsa loquitur and the inferences arising therefrom upon which I have instructed you does not alter or change the burden of proof in this case which rests upon the plaintiff as heretofore explained."

In determining whether res ipsa loquitur is available to a plaintiff attempting to prove that a physician has not exercised the proper degree of care, each case must be determined on its own facts. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 165 [41 Cal.Rptr. 577, 397 P.2d 161].)

As a general rule res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible (*Siverson* v. *Weber* (1962) 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].) Obviously the second portion of this requirement is met in the case at bench, for it was Dr. Feinstein who performed the operation which caused the injury. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied on both common knowledge and the testimony of expert witnesses. (*Id.*)[2] Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine of res ipsa loquitur should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible. (*Siverson* v. *Weber*, *supra*, at p. 839.) The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation. (*Siverson* v. *Weber, supra*, at p. 839; *Dees* v. *Pace* (1953) 118 Cal.App.2d 284 [257 P.2d 756].) To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation in the use of operations or new procedures involving an inherent risk of injury even when due care is used. (*Mundt* v. *Alta Bates Hospital* (1963) 223 Cal.App.2d 413, 422 [35 Cal.Rptr. 848].) On the other hand, it has also been pointed out that a "conspiracy of silence" does exist, and no matter how lacking in skill or how negligent a physician may be, it is frequently impossible to get other medical men to testify adversely to him. As a conse-

---

[2]The more esoteric kinds of medical causation demand expert testimony; others are within the reach of lay experience. (*Inouye* v. *Black* (1965) 238 Cal.App.2d 31, 34 [47 Cal.Rptr. 313, 14 A.L.R.3d 961]; cf. *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561]; and *Siverson* v. *Weber* (1962) 57 Cal.2d 834 [22 Cal. Rptr. 337, 372 P.2d 97].)

quence, even in cases in which it reasonably appears that the uncommon complication was probably the result of negligence, the patient may be totally unable to establish this fact by his own experts. Unless he can rely upon the doctrine of res ipsa loquitur, therefore, he may be denied the relief to which he is justly entitled. (See *Salgo* v. *Leland Stanford etc. Board of Trustees* (1957) 154 Cal.App.2d 560, 568-569 [317 P.2d 170].)

Recently the California Supreme Court has expanded the factors to be considered in determining whether the doctrine of res ipsa loquitur is applicable. In *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, it was recognized that although when due care is exercised an injury rarely occurs, such injury accompanied by other evidence indicating negligence, may be sufficient to warrant an instruction on conditional res ipsa loquitur. This rule was applied and approved in *Clark* v. *Gibbons* (1967) 66 Cal.2d 399 [58 Cal.Rptr. 125, 426 P.2d 525], where it was said: "The likelihood of a negligent cause is increased if the low incidence of accidents when due care is used is combined with proof of specific acts of negligence of a type which could have caused the occurrence complained of. When those two facts are proved, the likelihood of a negligent cause may be sufficiently great that the jury may properly conclude that the accident was more probably than not the result of someone's negligence. That a doctor has done a negligent act of a type that could have caused the accident, which does not ordinarily occur in the exercise of due care, greatly increases the probability that it was his negligence that caused the plaintiff's injury. Thus, the low incidence of accidents when due care is used plus negligent conduct of a type which could have caused the occurrence may make it probable that the occurrence was the result of someone's negligence and that the defendant is probably the person who is responsible. Those are the requirements for applying res ipsa loquitur." (P. 413.)

In the trial of an action for medical malpractice there generally are, as in the case at bench, two questions: (1) are the circumstances such as to permit the application of the doctrine of res ipsa loquitur, and (2) was the doctor negligent? Even though the doctrine applies, the evidence may show that there was no negligence. On the other hand, even though the doctrine does not apply, the evidence may show that the doctor was negligent. The doctrine when applicable raises an inference of negligence.

 Obviously, this is not a case in which common knowledge can apply. Because of the unusual type of surgery the layman necessarily has no knowledge of either the procedure or the danger inherent therein. The question of whether injury may result from the operation in spite of the use of due care by the surgeon is one which only the medical experts in that field can answer. At the trial there was no expert testimony which would indicate a probability that the injury was caused by the negligence of defendants. On the contrary, the expert witnesses all were emphatic in their testimony that the type of injury which occurred was one of the risks of that type of operation and that such an injury "happens in the hands of the best accepted neurosurgical care and technique."

Dr. Henry Wycis of Philadelphia, a neurosurgeon and a pioneer in the development of stereotaxic surgery, with a world wide reputation in this field, testified that in his opinion defendants exercised the degree of care and skill ordinarily exercised by competent neurosurgeons; that in this type of operation "it is common to tear the dura"; that cutting is apt to occur from use of the trephine; that cutting of the dura, the pia and a part of the cortex is one of the risks of this type of surgery; and that cutting and hemorrhaging "happens in the hands of the best accepted neurosurgical care and technique." Dr. Eugene Webb, a San Francisco medical doctor specializing in the field of neurosurgery, testified that in the exercise of good neurosurgical skill damage to blood vessels is inevitable and that hemorrhaging as a result is one of the inherent risks of this type of surgery. He pointed out that depths of skulls from one point to another vary, and that the problem in using the trephine is either in not going clear through the bone or taking a calculated risk of cutting the vessels below when the operator does go through the bone. He said that in the exercise of good surgical practice one could still lacerate the dura and produce hemorrhage.

From the expert testimony it is clear that it could not be said that in the light of past experience the accident here (the cutting of the dura, pia and cortex) was probably the result of negligence. Therefore, from the happening of the accident, without an actual showing of negligence, an inference of negligence may not be drawn.

Plaintiff contends that it is common knowledge that a trephine instrument when properly handled cannot cause injury and that therefore when an accident results from its use the

jury is immediately entitled to infer that the injury could not have occurred except for negligence of the surgeon. This is contrary to the unanimous opinion of the experts. Moreover, a layman could not have knowledge of the medical and surgical aspects of a trephination, and therefore, could not infer from the fact of injury alone that the surgeon was negligent. However, if the evidence as to how the surgery occurred and an injury resulted actually showed the surgeon to have been negligent, the jury could so find, not on res ipsa loquitur, but on the facts of the occurrence. Plaintiff's reply brief states: "[T]here was ample evidence to enable the jurors to use their own knowledge, experience and reasoning powers in determining whether or not Dr. Feinstein exercised the requisite care and skill of a neurological specialist when he cut through the outer surfaces of the plaintiff's brain and into the cortex while using an instrument which was not designed to cut the brain and which he did not intend to use to cut the brain." But this evidence went to the question of actual negligence in the performance of the operation and not to the question of whether a layman has knowledge such that "it can be said, in the light of past experience, that it [the accident] probably was the result of negligence." (*Siverson* v. *Weber, supra,* at P. 836.)

However, as was said by Chief Justice Traynor in *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 421, we are compelled by *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, to hold that the res ipsa loquitur instruction should have been given. ██ As he points out at page 423: "The essence of *Quintal* is restated in the majority opinion, which first discredits rarity alone as a basis for res ipsa, but then states: 'The likelihood of a negligent cause is increased if the low incidence of accidents when due care is used is combined with proof of specific acts of negligence of a type which would have caused the occurrence complained of. When these two facts are proved, the likelihood of a negligent cause may be sufficiently great that the jury may properly conclude that the accident was more probably than not the result of someone's negligence.' "

██ There was evidence in the case at bench of low incidence of accidents in trepanning operations. Dr. Feinstein himself testified that in only two out of 900 stereotaxic procedures performed by him and his colleagues had anything gone wrong, and, as hereinafter set forth there was some evidence of negligence. *Quintal* holds in effect, too, that if inferences of

negligence may be drawn "predicated on circumstantial evidence," res ipsa loquitur applies as it is "a doctrine fundamentally predicated on circumstantial evidence." (P. 163.) Thus, we have a situation where if inferences of negligence appear in the evidence, we must infer through res ipsa loquitur that an inference of negligence applies.

*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 413, similarly to *Quintal,* holds that the combination of a low incidence of accidents plus specific acts of negligence compels the giving of the res ipsa instruction.

2. Evidence of Negligence.

The evidence, absent the doctrine of res ipsa loquitur, was such that the jury could have found the surgeon negligent. ▉ In using the trephine to cut out a bony segment of the skull there are four safeguards upon which the surgeon relies. There are: (1) the X-rays which indicate the thickness of the skull and which guide the surgeon in setting the guard on the trephine; (2) the guard on the trephine; (3) the fine probe which the surgeon may use to test the opening in the skull; and (4) the surgeon's own sense of touch which enables him to determine the difference between tissue and bone.

There was no evidence that the X-rays were in any way faulty, but in view of the fact that the jury could have inferred that the guard on the trephine had been improperly adjusted, the jury could possibly have inferred that the failure to adjust the guard was because of misreading the X-rays. Although Dr. Feinstein testified that he had set the guard properly, the fact remains that the trephine cut deeper than he intended it to cut. As to the probe, he could not recall whether or not he had used a probe and no mention of using one appears in his report of the operation. However, there was no testimony that failure to use the probe would constitute negligence.

A study of Dr. Feinstein's testimony would justify the jury in finding that for some reason not apparent he departed from his usual practice in this type of operation. He testified that he usually cut the bone down to a thin shelf and then broke but did not cut that shelf with the trephine. However, although in his statement concerning the operation he said that he used the trephine intending only to "*get to* the fibrous tissue and remaining thin shelf of bone" (italics added), his testimony on cross-examination is subject to the interpretation that he intended to and did cut the bone shelf rather than break and lift it. The doctor's testimony was contradictory in

that in his operation report he indicated that the *trephine* cut the dura, etc., whereas during the trial he stated that he did not know whether the trephine cut the dura or whether the dura adhered to the bone and was torn when he lifted the bone. Tearing was a "possibility" although at the time he made the operation report he did not think of that possibility. In his report he had stated that "obviously" the trephine had cut deeper than the pia and entered the cortex. Dr. Feinstein testified that normally in the second procedure he would not have to cut more bone than was cut in the first procedure, that he "could just break it loose after going almost all the way through in the first procedure." He made no measurement of the first cut and could not recall whether he had cut bone in the second procedure. Dr. Feinstein testified that before plaintiff's operation defendants had performed somewhat over 900 "procedures" and that in only two of them had the patient's brain been cut. The doctor testified that if the guard is properly set the trephine will not go into the dura. Thus, the error in his action was that he cut too deeply, the trephine going not only through the bone shelf but through the dura and the pia, as well as into the cortex.

Although it was defendant's custom to write to the referring physician to tell him what had happened and Dr. Skillicorn had been advised that he would be kept informed by Dr. Feinstein, Dr. Skillicorn was not advised of the outcome of the operation.

In *Fowler* v. *Seaton* (1964) 61 Cal.2d 681, 689 [39 Cal. Rptr. 881, 394 P.2d 697], the court said concerning the defendant's conflicting stories: "From this the jury could infer that defendant had a consciousness of guilt. This itself is evidence of a circumstantial nature that goes onto the scales in determining whether 'it is more probable than not' that the injury was the result of defendant's negligence."

Plaintiff and his wife testified that Dr. Feinstein told them that plaintiff's postoperative condition was due to a stroke and did not inform them that there was a cutting of the brain. The doctor denied telling them that there was a stroke, but that if he had said anything about a stroke he would have said the condition was in the nature of a stroke. The doctor also testified that he told them the condition was due to a brain hemorrhage without stating its exact cause. It was for the jury to resolve the conflicting testimony. It was also for the jury to determine whether the statements which they

found the doctor to have made, and the conflict between the postoperative report and the testimony of the doctor bore in any way upon the evidence of fault.

3. Defendants Did Not Waive Their Rights to Question the Giving of the Res Ipsa Loquitur Instruction.

 Plaintiff contends that by offering two instructions on the doctrine, defendants thereby waived their right to object to the giving of the res ipsa loquitur instruction given by the court. This contention is without foundation and should not have been advanced by plaintiff for the reason that on each of the two res ipsa loquitur instructions offered by defendants appears a statement that it is only to be given if the court gives the instructions on res ipsa loquitur offered by plaintiff. Obviously this does not constitute a waiver of any kind.

4. The Written Release.

Plaintiff and his wife executed two written agreements in the same form (one executed before the first operative procedure and the other before the second). These purported to relieve defendants from liability due to any and all untoward risks or complications resulting from the stereotaxic surgical procedures. (Plaintiff and Mrs. Belshaw testified that they did not read the documents they signed.) The court ruled that these documents were void as being against public policy.

The leading case on the subject of this type of agreement is *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], where the court considered the validity of a release from liability for future negligence imposed as a condition for admission to a charitable research hospital. After reviewing the authorities the court held that such an exculpatory provision will stand only if it does not involve "public interest." It then held that an exemption from liability is invalid if the transaction exhibits some or all of the following characteristics: (1) It concerns a business of the type generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public; (3) the party holds himself out as willing to perform this service for any member of the public coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any mem-

ber of the public who seeks his services; (5) in exercising a superior bargaining power the party confronts the public with a standard adhesion contract of exculpation, and makes no provision whereby additional reasonable fees may be paid to obtain protection against negligence; (6) as a result of the transaction, the person or property of the member of the public is placed under the control of the party seeking exculpation, subject to the risk of carelessness by that party or his agents. When all or most of these circumstances exist, the Supreme Court held, the public policy of this state is violated. Since the service involved is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another's negligence.

Public policy does not favor ''agreements'' which shift the risk of negligence from the actor to the victim, where the latter is not in an equal bargaining position.

In *Tunkl* it was held that the agreement had *all* of the characteristics of a contract of exculpation affecting the public interest, for the following reasons: (1) a hospital is suitable for, and it is a subject of, public regulation; (2) the services of the hospital to those members of the public who are in special need of the particular skill of its staff and facilities constitute a practical and crucial necessity; (3) the hospital holds itself out as willing to perform its services for those members of the public who can qualify for them; (4) in insisting that the patient accept the exculpatory provision in the contract, the hospital certainly exercised a decisive advantage in bargaining, since the would-be patient is in no position to reject the agreement, to bargain with the hospital or in lieu of agreement to find another hospital; (5) in view of these circumstances the agreement must be regarded as an adhesion contract; (6) when the patient signed the contract, he placed himself completely in the control of the hospital and he subjected himself to the risk of its carelessness.

Practically all the reasons given in *Tunkl* for holding invalid the hospital release agreement apply to the agreements in the case at bench.

Obviously the instant releases concerned physicians and a hospital, all suitable for and subjects of public regulation. Defendants, being the only physicians in this area capable of performing stereotaxic surgery and holding themselves out as willing to perform their services for the members of the public needing them, constituted a practical and crucial necessity to

those members of the public who had special need of the doctors' specialized treatment. The doctors exercised a decisive advantage in bargaining, when plaintiff signed the release he placed himself completely in the control of the defendants and the hospital and subjected himself to the risk of carelessness on the part of defendants.

Therefore, the release agreements meet at least some of the characteristics of agreements which affect the ''public interest'' as described in *Tunkl*. The trial court correctly concluded that the exculpatory portions of the agreements are invalid.

 Not all contracts redistributing the risk of liability from one's own negligence are void as shown by *Werner* v. *Knol* (1948) 89 Cal.App.2d 474 [201 P.2d 45]; *Mills* v. *Ruppert* (1959) 167 Cal.App.2d 58 [333 P.2d 818]. However, as pointed out in *Tunkl* at page 96: ''the decisions are uniform. The cases have consistently held that the exculpatory provision may stand only if it does not involve 'the public interest.' '' The exculpatory provisions in the instant case definitely involve the public interest. Hence the agreements are void.

The judgment is affirmed.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied March 8, 1968, and appellants' petition for a hearing by the Supreme Court was denied April 4, 1968.