[Civ. No. 18321. First Dist., Div. One. Jan. 25, 1960.]

MARGARET CHO, Respondent, v. S. LAWRENCE
KEMPLER et al., Appellants.

Peart, Baraty & Hassard, George A. Smith and Richard G. Logan for Appellants.

Bruce Walkup for Respondent.

TOBRINER, J.—Respondent obtained a verdict for malpractice against appellants who contend here that the trial court prejudicially erred in both the rendition and form of an instruction on res ipsa loquitur. Since the application of the doctrine must intimately relate to the facts, we review the clinical history of the case and the expert testimony as to the involved medical procedures. We shall test the applicable cases against these facts. Finally, we analyze the form of the instruction. Our review convinces us that the trial court did not commit error.

We begin with the clinical history of the case. When respondent went to Greens' Eye Hospital for treatment for pain in the area of her left ear, she was referred to appellant Dr. Kempler, who, after examination, recommended a mastoidectomy. Dr. Kempler did not tell her that such an operation involved any risk of facial paralysis. Approximately two weeks later, on October 14, 1954, Dr. Kempler, assisted by Mrs. Feldstein, a nurse-anesthetist employed by the hospital, performed a modified radical mastoidectomy. During the operation, respondent, under a general anesthetic, was, of course, unconscious.

After the operation, respondent suffered these severe symptoms, which she had not previously experienced: the left side of her face was crooked, paralyzed, numb; her left eye remained constantly open; she was subject to uncontrollable drooling. Dr. Kempler told respondent that "something went wrong, but he didn't know actually what had happened" and that she "might be all right in a day or two." When on October 21, 1954, respondent was discharged from the hospital her facial condition had not improved.

During the month following the mastoidectomy respondent's condition deteriorated. Concluding that unless respondent underwent another operation she would be stricken with a permanent facial paralysis, Dr. Kempler suggested to respondent that Dr. Robert C. Martin perform another operation to ascertain the cause of the paralysis and to attempt to remedy it. On November 15, 1954, after respondent's readmission to Greens' Eye Hospital, Dr. Martin, assisted by Dr. Kempler, operated. The second operation revealed that during the mastoidectomy Dr. Kempler had completely severed respondent's facial nerve, the seventh cranial nerve, which is both a motor and sensory nerve controlling voluntary and involuntary sense of taste and facial expression. In an attempt to repair the nerve, Dr. Martin removed a section of the postoricular nerve in respondent's neck and grafted that piece to the severed ends of the facial nerve. While the postoricular nerve is not a motor nerve, it is a sensory one, and the removal of a portion of it caused an anesthesia in respondent's neck.

After this second operation respondent took therapy treatments at Stanford Hospital, first, from a Dr. Johnsson, and, later, from Dr. Northway. After paying Dr. Johnsson $10 for the first treatment respondent objected and told Dr. Kempler that he should take care of such costs. Thereafter

respondent was not billed for the therapy treatments, which extended over a seven-month period. Nor was she billed for the second operation or the subsequent medical care.

Shortly after the second operation Dr. Kempler, in answer to respondent's question as to what had been done in that operation, said, " '[W]e took a nerve out of your neck.' " Respondent then asked, "Well, how come you did that?" According to respondent, Dr. Kempler answered, "Well, we went in there and found that he [Kempler] had cut the facial nerve. It was his fault and his responsibility, he wanted to repair it, . . . [to] take a nerve from the neck here and transplant it to the nerve that was cut."

The second operation did not accomplish the desired full recovery. While Dr. Heck estimated that respondent had thus regained 75 per cent of the function of the facial nerve, she could not, at the time of the trial, move the left side of her face. Her left eye continuously watered; the eye itself had sunken into her face; respondent could not close it. While the second operation had improved her appearance, respondent's nose at all times felt blocked; her voice sounded as though she had a continuous cold; food had lost its taste; her lips were dry and stiff, and the left side of her tongue remained numb.

We turn to the testimony as to the procedure of the operation itself. Prior to 1942 the surgeon performed the mastoidectomy by proceeding from behind the ear, using chisels and gouges for the removal of the bone. Since that time, however, the operator goes through the ear itself, utilizing instruments which are variously shaped burrs, driven by an electric motor, similar to a dentist's drill. The burr rotates at a high rate of speed grinding the bone in order to lower the walls which separate the three cavities. To reach the areas which cannot be probed without difficulty by the burr the surgeon uses a rongeur which clips in a manner similar to that of a nail clipper.

Both the bony encasement of the facial nerve and the observance of recognized precautions curtail the danger of the possible transection of that nerve. With the exception of the area of one-eighth of an inch the bone completely surrounds the facial nerve. Dr. Kempler himself admitted that he severed the nerve where it is encased in a bony cavity, probably while using the rongeur. Dr. Martin, appellant's witness, supplemented Dr. Kempler's explanation as to the encasement of the nerve. According to Dr. Martin, "it would

be practically impossible to snip . . . [the nerve] with a rongeur'' in the area where it was severed. Dr. Martin gave as the reason for this statement the fact that the nerve is encased in ''solid bone'' which he likened to ''the lead sheath around a cable . . .'' ''[e]xcept that it is much harder.''

Four safeguards protect against possible transection of the nerve. Dr. Kempler, testifying as to the procedure which the surgeon should follow in the exercise of standard care, set up these precautions: First, when the surgeon sees the bone of the horizontal semicircular canal he knows the facial nerve lies under it; this is the clearest and most reliable landmark because the bone is harder and lighter than any other bone in the area; the surgeon should not probe deeper than this bone. Second, the surgeon should see that portion of the facial nerve which is visible, although, with the exception of one eighth of an inch, it is within the bone. Third, if the artery which supplies the facial nerve is cut, sudden, brisk bleeding follows, which is a warning that the surgeon is very close to the facial nerve; hence, standard care requires that the surgeon watch for such bleeding. Fourth, when the surgeon approaches this area he should tell the anesthetist she should watch the patient's face for any twitching; visible signs or sudden motion of the patient's face disclose any possible contact with the nerve; prompt advice from the anesthetist enables the surgeon to withdraw the instrument.

With the exception of the fourth, the testimony did not show any failure to observe the safeguards. The record shows that while Dr. Kempler, in accordance with the fourth safeguard, did inform the nurse-anesthetist that he was approaching the facial nerve, there is some inconsistency in the testimony as to whether or not he did specifically instruct the nurse-anesthetist to watch for the facial twitching. She was, however, both an experienced anesthetist and trained to look for such twitching in order to call it to the doctor's attention. Moreover, in this case respondent had been given a drug to relax her which would preclude any twitching.

The transection of the nerve is a very rare occurrence. Although Doctors Martin, Heck and Sooy testified that injury to the facial nerve could result during a mastoidectomy without negligence, Dr. Martin had performed 500 mastoidectomies and 300 fenestration operations and Dr. Sooy 600 of such operations without severing the nerve. In one case Dr. Sooy had bruised the nerve and in another partially

cut it but there had been no permanent damage. Appellant Kempler himself performed or assisted in 230 mastoidectomies and in none did the facial nerve suffer injury. In one of the 50 cases observed by Dr. Kempler the surgeon had severed the nerve but this operation had been performed in 1940 under the old practice. Since 1929 Dr. Martin has performed 28 repair operations for damage to the facial nerve, 80 per cent of which arose from mastoidectomies performed under the old method. In none of these, however, did the surgeons admit error; indeed in an article contributed to a medical journal Dr. Martin wrote, "[T]he history was completely unreliable because none of the operators could give a reasonable explanation of what happened, they or anybody else."

Dr. Kempler gave no explanation for the transection of the nerve with a rongeur in an area in which Dr. Martin stated that severance was virtually impossible. Dr. Martin suggested the possibility that a surgeon could easily "get disoriented. It is very easy with a small mastoidectomy, quite quickly you can cut . . . [the nerves] across. . . ."

Since appellants contend that the instruction on res ipsa loquitur should not have been given, and, as given, erroneously stated the apposite tests, we must, first, analyze the prerequisites of the application of the doctrine in malpractice cases, and, second, determine whether the facts here meet those prerequisites.

The res ipsa doctrine in recent years has had a wider and more frequent application in the malpractice field. For one thing, the courts have found in many cases sufficient facts to fulfill the special requirements of the doctrine and, for another, as we shall point out, have become more acutely aware of the need to protect an injured patient by inducing the physician to explain the reason for the injury or suffer the penalty of an adverse inference in the absence of such explanation.

■ The recent Supreme Court decision of *Wolfsmith* v. *Marsh* (1959), 51 Cal.2d 832 [337 P.2d 70], establishes three basic requirements for application of the res ipsa instruction in such a case. The *first* classic postulate is set out in three subsections: "(a) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c) it must not have been due to any voluntary action or contribution on the part of the plaintiff." (P. 835.) ■ The *second* funda-

mental element is that in deciding whether or not the injury resulted from negligence "the courts have relied upon both (a) common knowledge and (b) the testimony of expert witnesses, as well as the circumstances relating to the accident in each particular case." (*Idem.*) ▉ The court expresses a *third* further rule in that "[t]he conclusion that negligence is the most likely explanation of an accident or injury is not for the trial court to draw or refuse to draw so long as plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence, though the court itself would not draw that inference." (Pp. 835-836.)

The Wolfsmith case is the latest expression of the Supreme Court in the historical development of the res ipsa doctrine in malpractice cases. Wolfsmith involved a refusal of the trial court to give a res ipsa instruction in a situation in which defendants injected into plaintiff's knee a solution of sodium pentathol. Although she had sustained previous injections without untoward results, plaintiff developed at the site of the injection a thrombosis and ultimately a "slough" ulcer. The Supreme Court reversed the trial court for refusal to instruct on res ipsa because it found that on the basis of common knowledge and the medical testimony the prerequisites of the stated test were met.

Earlier malpractice decisions invoked the res ipsa doctrine. *Ybarra* v. *Spangard* (1944), 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], asserts it in a situation arising from the traumatic injury to plaintiff's shoulder, which was apparently due to some kind of pressure or strain sustained during the course of an operation for appendicitis. Likewise, in *Cavero* v. *Franklin etc. Benevolent Soc.* (1950), 36 Cal.2d 301 [223 P.2d 471], the court applied the res ipsa inference to the death of plaintiff's child, apparently caused by the application of an ether anesthetic during the course of a tonsillectomy. *Seneris* v. *Haas* (1955), 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124], involved a paralysis of a plaintiff's legs that coincided with a routine obstetrical case. After administration of a spinal anesthetic, plaintiff gave birth to a daughter, but upon awakening the next morning found her legs paralyzed. The Supreme Court reversed the trial court for its failure to instruct on res ipsa.

The increasing use of res ipsa loquitur exemplifies the growing recognition of the courts of the special obligations which arise from particular relationships. Prosser, *Res Ipsa Loquitur in California,* 37 Cal. Law Rev. (1949) 183, points out that

"where the particular defendant is in a position of some special responsibility toward the plaintiff or the public" (p. 224) the doctrine is designed to protect the dependent party from unexplained injury at the hands of one in whom he has reposed trust. The device "has been used by the courts, consciously or otherwise, as a deliberate instrument of policy imposing a procedural disadvantage upon the defendant which will require him to establish his freedom from negligence or to pay." (*Idem.*) ▮ In an integrated society where individuals become inevitably dependent upon others for the exercise of due care, where these relationships are closely interwoven with our daily living, the requirement for explanation is not too great a burden to impose upon those who wield the instruments of injury and whose due care is vital to life itself.

▮ In the light of these general observations and the specific requirements of Wolfsmith, did the court commit error in giving the instruction here?* Conditions (b) and (c) of the first postulate have been fulfilled; only (a) remains for analysis: the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence. As the Supreme Court points out, while the answer to this query may rest upon both common knowledge and expert testimony, the court need find no more than that there are sufficient facts "to permit the jury to draw the inference of negligence." (*Wolfsmith* v. *Marsh* (1959), 51 Cal.2d 832, 836 [337 P.2d 70].) "[T]he court must still leave the question to the jury

---

*We are indebted to the forthcoming publication, Louisell and Williams, Attorneys' Textbook of Medical Malpractice (Matthew Bender), for a listing of seven cases in which mastoidectomies were performed and injury to the facial nerve ensued. In one, *Marlowe* v. *Patrick* (1935), 181 Wash. 647 [44 P.2d 776], the court upheld in substance application of a res ipsa instruction although it did not refer to the matter by name, stating that it was unnecessary that the negligence be proved by direct and positive evidence in a case in which "perfectly sound tissue was injured" and no one disclosed or testified as to "just what appellant did or how he did it." (P. 779.) Three cases refused to apply the res ipsa instruction: *Bettigole* v. *Diener* (1956), 210 Md. 537 [124 A.2d 265]; *Schoening* v. *Smith* (1930), 59 N.D. 592 [231 N.W. 278]; *Calhoun* v. *Fraser* (1938), 23 Tenn.App. 54 [126 S.W.2d 381]. In *Alberti* v. *Gordon* (1937), 224 Wis. 439 [272 N.W. 352], the court refused to draw an inference from the paralysis but did not discuss the res ipsa inference as such. In *Cavallaro* v. *Sharp* (1956), 84 R.I. 67 [121 A.2d 669], the court did not discuss the instruction. Finally, in *Paulsen* v. *Gundersen* (1935), 218 Wis. 578 [260 N.W. 448], the court discusses special interrogations and the case is not in point as to the res ipsa doctrine. A reading of the extra-state cases demonstrates that they are based upon a different historical conception of the res ipsa doctrine than is now current in California.

where reasonable men may differ as to the balance of probabilities. . . ." (*Seneris* v. *Haas* (1955), 45 Cal.2d 811, 827 [291 P.2d 915, 53 A.L.R.2d 124].) ▇▇ The jury must "determine the facts upon which the doctrine would or would not arise." (*Salgo* v. *Leland Stanford etc. Board Trustees* (1957), 154 Cal.App.2d 560, 572 [317 P.2d 170].)

▇▇ The record discloses five main categories of fact from which the jury could have found the accident was such as would not ordinarily have occurred in the absence of negligence.

(1) The solidity of the surrounding bone and the impossibility of severance of the nerve without severe external traumatic force in itself points to the probability of negligence. The very inherent structure of the anatomy is one factor that evinces a likelihood of medical error: the injury would not occur except for gross impact of the surgeon's instrument upon a substance harder than "the lead sheath around a cable." The layman is not incapable of understanding and concluding that the destruction of such protective substance would not probably occur in the absence of negligence.

(2) The practical impossibility of inflicting such injury, coupled with the *rarity* of its occurrence enhances the likelihood the injury would not take place in the absence of negligence. Rarity, as appellant contends, is insufficient in itself, but rarity, here, compounded with many other aspects, plays its part as an element of decision. As we have pointed out, three testifying doctors had performed, or assisted in, some 1,630 mastoidectomies or fenestrations without a single instance of severing the nerve.

(3) According to the medical testimony, and that of defendant himself, "if standard care . . . were used" "severance of the nerve would not occur," under ordinary circumstances, although "it does occur and has occurred and will occur." "It is possible" to injure the nerve but " [i]t is not likely." Hence the medical testimony, in this first respect, afforded the jury a basis to find as a fact that the injury does not *ordinarily* eventuate in the absence of negligence.

In a second respect the medical testimony afforded another possible ground for such a finding: Dr. Martin, a recognized authority in the field, who testified on behalf of defendant, said, " [Y]ou may get *disoriented*. It is very easy with a small mastoidectomy. . . ." (Emphasis added.) Disorientation in itself is a form of negligence. A gross instance of disorientation is the action of the motorist who drives into

an intersection against a stop light and causes injury. He can hardly excuse his error on the ground of disorientation and loss of direction. A surgeon in a delicate operation must, surely, meet the standard of proper orientation or determination "of direction or relative position in general" (definition of "orientation," Century Dictionary and Cyclopedia, Century Co., New York). The only explanation which Dr. Martin could offer for such injury described negligent conduct upon the part of a surgeon.

(4) The fact that the four safeguards set out *supra* protect against the severance of the nerve, and that the accident should not have happened if the precautions were observed serves as a ground for the finding that the accident does not happen in the absence of negligence.

(5) The fact that respondent physician, according to appellant, admitted that he was "at fault" and that appellants paid both the costs of the second operation as well as subsequent expenses constituted evidence upon which the jury could make the finding. Appellant claims that testimony regarding the alleged admission could not be considered in this connection because it refers to this particular case rather than the general probability that the injury would not have occurred in the absence of negligence. But the fact that even in one case the injury was caused by negligence, and not by other factors, would have some bearing, even if minor, upon the probability, in general, that the injury does not ordinarily occur except from negligence.

Appellant's answer that *Dees* v. *Pace* (1953), 118 Cal. App.2d 284 [257 P.2d 756], states that an "admission of negligence" of a defendant doctor in a malpractice case "would be evidence of a specific act of negligence and would not afford a basis for the giving of instructions on res ipsa loquitur" (p. 290) is weakened by these considerations: (1) in the Dees case no medical testimony whatever supported plaintiff's contention that the fistula "ordinarily does not happen unless there was negligence"; the sole such testimony consisted of the admission; the court held this statement in itself insufficient; (2) in the recent case of *Wolfsmith* v. *Marsh, supra* (1959), 51 Cal.2d 832, 836, the Supreme Court points out that the Dees case itself states, "There is no testimony in the record here, either expert or otherwise, that would support the submission of such an issue to the jury"; (3) the Dees decision, a divided one, relied upon *Engelking* v. *Carlson* (1939), 13 Cal.2d 216 [88 P.2d 695], which in

turn has been overruled by the Supreme Court in *Seneris* v. *Haas, supra* (1955), 45 Cal.2d 811, 827; (4) the language of *Sherman* v. *Hartman* (1955), 137 Cal.App.2d 589 [290 P.2d 894], explains that an admission of negligence, in addition to other expert testimony, will support the rendition of the res ipsa instruction: "It is unnecessary to determine here whether the common experience of a layman in blood transfusion cases is that the results here do not occur without negligence, for the reason that the expert testimony of all the doctors, *in addition to plaintiff's testimony that defendant told her someone had been negligent,* was that, while in transfusions the needle frequently comes out of the vein, causing a small amount of blood to get into the soft tissue, it does not cause the condition of plaintiff's arm. Thus, the first element required for the application of the doctrine was present, namely, the accident is one which ordinarily does not occur in the absence of someone's negligence." (P. 595; emphasis added.)

We conclude that the instruction rested upon a sufficient evidentiary basis; we consider, next, the alleged error in the form of the instruction.

 Appellants contend that even if the jury should have been instructed on res ipsa, the court erroneously stated the instruction. They predicate this contention on a portion of the instruction which reads: "Second: The fact that the accident was one of such nature as does not happen in the ordinary course of things, if those who have control of the instrumentality use ordinary care." Appellants argue that since respondent Kempler conceded the nerve was not severed in the ordinary course of mastoidectomies the instruction in effect directed the jury to apply the doctrine. The court, however, admonished the jury "not [to] single out any certain sentence or any particular instruction and ignore the others, but consider all the instructions as a whole, and in regard to all the other instructions." At the close of the instruction on res ipsa the judge added the further instruction: "The doctrine of res ipsa loquitur concerning which you have just been instructed, may be applicable to this case and may be applied by you only under the following circumstances: The accident, if any, of which the plaintiff complains must be a type which probably would not have occurred unless someone was negligent. You are further instructed that this fact, to wit: that the accident, if any, must be of a type which probably would not happen unless someone was

negligent in this case, must appear from competent evidence introduced at the trial of this case."

The court did not require the application of the doctrine upon the mere showing that such an accident does not occur "in the ordinary course of things"; it tied this statement into the following qualification: "*if* those who have control of the instrumentality use ordinary care." (Italics added.) The court, moreover, explained further that the accident must be a "type which probably would not have occurred unless someone was negligent." Under these circumstances the jury could not have been misled.

We affirm the judgment.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied February 16, 1960, and appellants' petition for a hearing by the Supreme Court was denied March 23, 1960.