[Civ. No. 33136. Second Dist., Div. Five. Nov. 18, 1969.]

BERNARD BERKEY, Plaintiff and Appellant, v.
FRANK M. ANDERSON et al., Defendants and Respondents.

## COUNSEL

Hillel Chodos for Plaintiff and Appellant.

Overton, Lyman & Prince, Kirtland & Packard, Fred S. Lack, Jr., Vincent W. Heublein and Ellis J. Horvitz for Defendants and Respondents.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, Alan L. Bonnington and Richard G. Logan as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**CHANTRY, J. pro tem.**\*—This is an action against respondent Rickenberg and his partners for malpractice in connection with the performance of a myelogram and against respondent Anderson for prescribing the myelogram without the informed consent of the appellant.[1]

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1] A technical battery is not alleged in the complaint, nor is it set forth as an issue in the pretrial statement. However, the entire case was presented on the basis that as to Dr. Anderson one of the issues was whether he had obtained the informed consent of appellant before sending him to the hospital for a myelogram. ". . . where one of the parties introduces evidence on an issue which was not included in the pretrial order, and the other party makes no objection to such evidence, then, despite the scope of the pretrial order, the matter will be deemed in issue. (*Collison* v. *Thomas*, 55 Cal.2d 490, 498 [11 Cal.Rptr. 555, 360 P.2d 51].)" *Alvarez* v. *Felker Mfg. Co.*, 230 Cal.App.2d 987, 998 [41 Cal.Rptr. 514].

At the conclusion of plaintiff's evidence the court granted defendants' motions for nonsuit, and this is an appeal from the judgment of dismissal thereafter entered. ■ In considering whether there was error in the granting of the nonsuit, we must be guided by the following rule: " 'A motion for nonsuit may properly be granted ". . . when, and only when, *disregarding conflicting evidence,* and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff." ' (*Seneris* v. *Haas,* 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124].)

The foregoing rule must be applied to the facts established by the following testimony:

In 1961 appellant Bernard Berkey fell down an embankment and injured his neck. He was treated for a few months by a doctor not involved in this case, and in mid-1961 he came under the care of respondent Dr. Anderson. Thereafter his condition improved enough to allow him to go back to work as a deputy field assessor for the County of Los Angeles, but on February 5, 1962, appellant again injured his neck while reaching into the back seat of his car. The next day Dr. Anderson conducted another neurological examination, at which time he discovered no abnormalities of the left leg or the lower back, and he concluded that appellant's problem was in his neck and that he should have a myelogram.

After this examination and pursuant to Dr. Anderson's advice, appellant went to the Good Samaritan Hospital on February 8, 1962, to undergo a diagnostic procedure known as a myelogram. At the time of entering the hospital, according to the appellant and the testimony of Dr. Anderson, the appellant had no trouble whatsoever with his lower back and legs, his disability being limited to the cervical spine and pains radiating down his left arm. Dr. Anderson testified that when the appellant first came to him in 1961, this was his only complaint and that after a physical and neurological examination, including tests of sensation and reflex activity of all extremities, electromyogram studies and X-rays of the upper body, he found no abnormalities of the left leg.

Appellant's version of what transpired at the time Dr. Anderson proposed a myelogram is as follows: While making the examination on February 6, 1962, Dr. Anderson said very little to him, but directed his nurse to ascertain if a bed was available at the hospital for a myelogram. Thereafter he stated to appellant, "We have to get to the bottom of this," and he said that he was going to place him in a hospital for a myelogram. Appellant asked if that was like the electromyograms which he had been

having, to which the doctor answered that it was simply exploratory and nothing to worry about; that the most uncomfortable thing about it was that he would be put on a cold table and tilted about, after being harnessed down; and that he would feel nothing, as Dr. Anderson would order that appellant be given a pain-killing injection. Appellant testified that at the time he had no knowledge of what was involved in a myelogram; that he had confidence in Dr. Anderson and believed his statements that the procedure was simply exploratory and no more serious than the electro-myograms he had been given. Appellant stated that he would never have permitted a puncture of his spine, as he had heard of dire results from spine injections. The nature of a myelogram was not explained by Dr. Rickenberg before it was performed, and Dr. Anderson testified he did not expect Dr. Rickenberg to do so, beyond making some fundamental comments. Dr. Anderson, in his testimony, never contended that he described a myelogram to appellant, beyond indicating that it was a further procedure in the diagnosis of his case.

Evidence was introduced that appellant drove to the hospital, carried his valise to the room, and in general had no difficulty whatsoever in the use of his legs.

The myelogram was performed by Dr. Rickenberg on February 8, 1962. This defendant is a consulting specialist, practicing solely at the Good Samaritan Hospital as a radiologist, and almost exclusively upon patients referred by other doctors for diagnostic procedures.

Dr. Rickenberg testified he had performed hundreds, perhaps thousands, of myelograms over a period of 20 years; that he had no recollection of this particular one, and that he testified solely from his records. He stated he had a routine procedure for administering myelograms, which he described as follows: The patient is placed prone upon a fluoroscopic table, to which table he is harnessed so that he will not move when it is tilted, and a spinal needle of 20 gauge, 3½ inches in length is introduced into the midline of the lumbar area, either at the third, fourth, or fifth lumbar interspaces (in this case he did not remember which). The needle is barrel-like with a solid core, or stylet, which is removable, and fluid may be forced or taken through the barrel when the stylet is removed. It is introduced between the spinous processes through the muscles of the back to reach the subarachnoid space, or spinal canal area, where the spinal fluid is located. In a properly performed myelogram the needle is inserted slowly, and if one is not sure of its position, the stylet can be removed, and it can be ascertained if spinal fluid is flowing through the needle. As the spinal fluid is under some pressure, it will escape through the needle if the subarachnoid space has been reached. The position of the needle can also be located at any time by the use of a fluoroscope. After the needle is introduced into the

subarachnoid space, the stylet is removed and 8 to 10 ccs. of spinal fluid are recovered and sent to the laboratory for analysis. With another syringe a substance called panopaque is introduced through the needle into the subarachnoid space. Because this substance is heavier than the spinal fluid, it acts like the bubble of a spirit level, and by tilting the table the panopaque can be made to flow back and forth in the spine of the patient. When the panopaque is centered in the area in which the doctor is interested, X-rays are taken. Because of the tilting of the table it is necessary that the patient be harnessed in place. To prevent the flow of panopaque to the brain, an assistant keeps the head of the patient up as far as possible. The needle is left in place, and if the X-rays prove satisfactory, as much as possible of the panopaque oil is removed by taking the stylet out of the needle and removing the oil through the barrel of the needle.

Appellant testified that in the course of the myelogram he felt a "couple of mild sticks I didn't mind at all" and suddenly he felt a terrific thrust as if someone were jamming an icepick into his lower spine; that he had never felt anything as excruciating as this before, and that a terribly sharp pain shot over his side and left leg. He testified he "let out a yell" and was told to "take it easy;" that he would be all right, and that it would pass over.

Following the myelogram, he was told to lie flat on his back for 24 hours, which he did. At the end of that period when he attempted to arise, he found that he had what he called a "rubber leg." When he put weight on the leg it buckled, and he had never experienced such difficulty before.

Dr. Anderson testified that upon an examination conducted March 1, 1962, he found symptoms not previously observed consisting of diminished sensation in the front of the left leg below the knee of appellant and a weakness in dorsiflexion of the left foot, sometimes referred to as "foot drop."

Dr. Faeth, who was consulted by the appellant after the myelogram, on August 2, 1963, testified that appellant had what he termed lumbar radiculopathy, which is a term indicating there is an irritation or compression of one of the nerve trunks arising from the lower end of the spine. It was his opinion that the fifth lumbar nerve root on the left side was involved. This nerve root exits from the spine in the interspace between the fourth and fifth lumbar vertabrae, and its motor component supplies muscles in the front portion of the lower leg, principally those which permit dorsiflexion of the foot—the ability to bring the foot upward. It was his further opinion that the most probable cause of appellant's symptoms was compression of the particular nerve as the result of a herniated disc, permitting the two vertabrae where the nerve exits to move closer together, thereby compressing the nerve between them. He described the interverte-

bral discs as wafer-shaped with a tough outer membrane or wall known as the annulus fibrosis, which covers the more gelatinous central portion, or nucleus, and that a rupture of the membrane permits the gelatinous portion to extrude, narrowing the intervertebral space. While giving a herniated disc as the most probable cause of appellant's difficulty, Dr. Faeth mentioned other possible causes: (1) The formation of a spur at the margin of the bone, which he described as a defense mechanism resulting when there is herniation of a disc. This could impinge on the nerve and produce identical symptoms. (2) A tumor. (3) Adhesions around the nerve trunk. (4) Other possibilities he termed remote and esoteric—hardening of the arteries and diabetes. He had no opinion as to what caused the rupture of the disc.

Dr. Faeth stated that in the course of a myelogram the needle can, and commonly does, come into proximity with the annulus fibrosis. The needle is either centered in the spinal canal or in some cases inserted to the bottom of the canal, because in the latter case it is believed to be easier to withdraw the fluid after the myelogram is completed. If the needle penetrates too far, it can strike the annulus fibrosis and pass through it. Dr. Rickenberg also testified to this effect, but he was not permitted to answer a question whether the likelihood of this happening was increased if the needle was jabbed in rather than inserted slowly. Dr. Anderson was also questioned concerning the procedure in performing a myelogram, and he stated it was possible to strike and puncture the annulus fibrosis during the procedure and that if it is ruptured or penetrated, it can result in extrusion of the disc and a narrowing of the interspace. However, he claimed this could occur only under special circumstances, such as by repeated injury with a large bore needle or in connection with a myelogram on a young person. There was also testimony it was possible to impale a nerve in the spinal canal with the needle and to cause injury to the impaled nerve. Dr. Rickenberg testified he had never heard of this happening, and he also testified that he had never heard of anyone suffering from foot drop as the result of a myelogram.

Since Dr. Anderson had nothing to do with the actual performance of the myelogram, the issues vary as between him and Dr. Rickenberg. Regarding Dr. Anderson, the questions are whether he obtained the informed consent of his patient before ordering the myelogram and if not, what damages proximately resulted; and as to Dr. Rickenberg, whether there was negligence in administering the myelogram and if so, whether the injury suffered was the proximate result of such negligence. If the evidence of negligence was sufficient by itself, or by properly applying the doctrine of res ipsa loquitur, the nonsuit as to Dr. Rickenberg would be error.

It is often emphasized that a fact to be considered in applying the

doctrine in malpractice cases is the superior knowledge on the part of the defendants of what occurs and that the chief evidence of the cause of the injury may be accessible to the defendant and inaccessible to the plaintiff. *Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124].

The courts have also pointed out that by reason of the unwillingness of persons in the medical profession to testify against each other, a party may be denied relief even in cases where "it reasonably appears that the uncommon complication was probably the result of negligence," unless he can rely on res ipsa loquitur. *Belshaw* v. *Feinstein,* 258 Cal.App.2d 711, 720 [65 Cal.Rptr. 788]; *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560, 568 [317 P.2d 170].

■ "Evidence necessary to form the basis for the application of the res ipsa loquitur doctrine need not establish the fact that the actual procedure followed by defendant was negligent; it is sufficient if it supports an inference of negligence from the fact that the injury occurred. The inference of negligence which the doctrine permits to be drawn is one which stems from the happening of the accident itself as distinguished from an inference of negligence drawn from evidence of specific procedures followed by the surgeon." *Fraser* v. *Sprague,* 270 Cal.App.2d 736, 746 [76 Cal.Rptr. 37].

" 'There does not have to be an eyewitness, nor need there be direct evidence of defendant's conduct. There is no absolute requirement that the plaintiff explain how the accident happened. Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. (Prosser on Torts, *supra,* at p. 204.)' (See also *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 164-165 [41 Cal.Rptr. 577, 397 P.2d 161].)" *Clark* v. *Gibbons,* 66 Cal.2d 399, 409 [58 Cal. Rptr. 125, 426 P.2d 525]. ■ ". . . the conditions to be met before the doctrine may be applied are that the accident, or injury, must be of a kind which ordinarily does not occur in the absence of someone's negligence; that it must be caused by an agency or instrumentality in the control of the defendant; and that it must not have been due to any voluntary action or contribution on the part of plaintiff." *Seneris* v. *Haas,* 45 Cal.2d 811, 823 [291 P.2d 915, 53 A.L.R.2d 124].

We are concerned with the first of these conditions. " ' "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply." ' In determining whether such a probability exists with regard to a particular occurrence, the courts have relied both

upon common knowledge and the testimony of expert witnesses." *Seneris* v. *Haas, supra,* at p. 824. ■ "Evidence that an accident rarely occurs when due care is exercised does not, without more, justify an inference of negligence." *Fraser* v. *Sprague,* 270 Cal.App.2d 736 [76 Cal.Rptr. 37]; *Silverson* v. *Weber,* 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97].

However, as stated in *Fraser*: "But evidence of rarity, together with some other evidence indicating negligence, may warrant a conditional res ipsa instruction, particularly if the injury resulted from a commonplace procedure rather than from a complex or unusual operation." *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 412, 413; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d 154, 165, 166; *Cho* v. *Kempler,* 177 Cal.App. 2d 342, 351 [2 Cal.Rptr. 167, 76 A.L.R.2d 774].

■ The rarity of the injury was established by the testimony of Dr. Rickenberg that he had performed thousands of myelograms over a long period of time and had never known of anyone suffering from foot drop as a result. No contention is made that the evidence is not sufficient to show that plaintiff's injury is not an inherent risk of the procedure. (See *Tangora* v. *Matanky,* 231 Cal.App.2d 468 [42 Cal.Rptr. 348].)

In the case at bench it is shown from the record (if it is not a matter of common knowledge), that a myelogram is a "commonplace procedure" rather than unusual or complex.[2] It was minutely described to the jury by Dr. Rickenberg and Dr. Faeth and does not seem complex. As shown, the myelographer is attempting to reach the spinal canal to insert the pano-paque without overshooting the canal and doing damage on the other side. To prevent the needle passing entirely through the canal, two, and possibly three, safeguards are available to the doctor. If he proceeds slowly, he can stop at any time and remove the stylet to see if spinal fluid is exuding from the barrel. He may also stop and use a fluroscope to ascertain the position of the needle, and he also knows the approximate diameter of the area he is attempting to reach.

Assuming the jury was entitled to find that appellant's foot drop was a consequence of the herniation of the disc at the interspace between the 4th and 5th lumbar vertebrae where the nerve controlling the leg exits, there was testimony from Dr. Rickenberg that he usually inserted the needle at the 3d, 4th or 5th lumbar interspace. It was shown that the needle would be in close proximity to the disc when fully inserted. Dr. Anderson testified a needle could rupture the annulus fibrosis at the disc, herniate it, and cause the vertebrae to compress the nerve, although he claimed the annulus

---

[2]In *Fraser,* an operation for the removal of the lesser saphenous vein is so regarded.

fibrosis would have to be struck repeatedly. Appellant felt a terrific thrust, like someone was jamming an ice pick right into his lower spine when the needle was inserted. He had never felt anything so painful and excruciating before. It was a terrible pain that shot over to his side and down his leg.

From the foregoing evidence of rarity and the medical testimony the jury could have inferred that the injury appellant suffered ordinarily does not occur in the course of a myelogram if the needle is carefully inserted and available safeguards are employed.

As stated in *Cho* v. *Kempler,* 177 Cal.App.2d 342, 350 [2 Cal.Rptr. 167, 76 A.L.R.2d 774], where the doctor severed a nerve under a readily identifiable bone, "The layman is not incapable of understanding and concluding that the destruction of such protective substance would not probably occur in the absence of negligence."

The court in *Cho* stresses that the jury can consider the availability of safeguards against injury. "The fact that the four safeguards set out *supra* protect against the severance of the nerve, and that the accident should not have happened if the precautions were observed serves as a ground for the finding that the accident does not happen in the absence of negligence." *Cho* v. *Kempler, supra,* at p. 351.

While it has been recognized that in determining whether res ipsa loquitur is available, "each case must be determined on its own facts." (*Belshaw* v. *Feinstein,* 258 Cal.App.2d 711, 719 [65 Cal.Rptr. 788]), this determination accords with cases in which the facts are somewhat similar. In *Seneris* v. *Haas, supra,* at p. 825, plaintiff, previously in good health, was suffering from paralysis when she awakened after a spinal anesthetic. The doctor testified he inserted the needle in the lumbar area where the spinal cord would not be present. It was conceded that to administer the anesthetic in the thoracic area would be bad practice and could injure the cord. Plaintiff's theory was that the anesthetic had been administered hurriedly (the records showed it was completed in two minutes) and that the needle had been inserted in the thoracic area. Defendant contended paralysis can result from causes other than negligence and that in a certain number of cases paralysis will result from the administration of an anesthetic without negligence and that there was no proof the practice used by him was not the desirable and standard practice. The court states: "It would appear that plaintiffs have made out a prima facie case by both medical testimony and common knowledge that the injuries suffered by Mrs. Seneris are not such as usually occur in the circumstances without negligence on the part of someone. Defendant West's assertions to the contrary are matters for the finders of the facts." While the courts in *Seneris* and in *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R.

1258], stress the fact of injury to a patient while unconscious in applying the doctrine, as a practical matter there is no distinction between that situation and one where by reason of the patient's position during the operation he is wholly unable to observe the procedure. This is of special importance here, where the manner in which the instrument was inserted and what tests were made during its insertion could be crucial in proving negligence.

In *Fraser* v. *Sprague, supra,* sufficient evidence in addition to rarity was held to be present. Plaintiff suffered from foot drop resulting from damage to the common peroneal nerve. It was shown by medical testimony that the nerve was at certain points about one centimeter from the vein being operated upon, and at other points the two were so close together that it was necessary to move the nerve to reach the vein. It was further shown that there were certain risks of nerve injury involved in the operation but that there are recognized techniques for its avoidance; that a witness had performed a thousand of the operations and had never encountered or heard of such an injury stemming from it. There was other testimony that if the operation is performed with usual care, and injury is unlikely, though possible, that it was unlikely the injury was caused during surgery and was more probably attributable to an over-tight bandage following it.

In *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], the plaintiff entered the hospital for an appendectomy. He had never theretofore had any pain in his right arm. Afterward he did have such a pain and eventually developed paralysis and atrophy of the muscles around the shoulder. There was evidence the injury was of traumatic origin. After first referring to another condition to application of the doctrine, the court states: ". . . and the same is true of the condition that the accident must be one which ordinarily does not occur unless someone was negligent. We have here no problem of negligence in treatment, but of distinct injury to a healthy part of the body not the subject of treatment, nor within the area covered by the operation. The decisions in this state make it clear that such circumstances raise the inference of negligence, and call upon the defendant to explain the unusual result." *Ybarra* v. *Spangard, supra,* at p. 491. See also *Cho* v. *Kempler, supra.*

In *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560 [317 P.2d 170], plaintiff claimed he suffered paraplegia after an aortography to determine the location of a block in his aorta. He was in extremely bad physical condition and, among other things, suffered from advanced arteriosclerosis, which medical testimony showed could cause the condition at any time. The court held that as far as laymen are concerned, it cannot be said that it is a matter of common knowledge that the injury results only where there is negligence.

The court held there is little question that an aortography and its results are not a matter of common knowledge to laymen; that few have heard of it; and that it could not be said, particularly in view of plaintiff's physical condition, so far as laymen are concerned, that it is a matter of common knowledge that injury results only where there is negligence in its use. However, the court also determined that with the expert testimony that the needle used in the procedure may have been inserted in the wrong place—in a spinal artery—when there was no testimony this could be done without negligence, the evidence warranted giving a conditional res ipsa loquitur instruction.

In *Tomei* v. *Henning,* 67 Cal.2d 319, 323 [62 Cal.Rptr. 9, 431 P.2d 633], it was held that whether, in the light of past experience, the accident was or was not probably the result of negligence was not a matter of common knowledge (suturing plaintiff's right ureter in the course of a hysterectomy) but that with the aid of expert testimony the jury was entitled to determine that the injury was not probable without the existence of negligence.

Certain cases relied upon by the respondent Rickenberg are significantly different. In *Crawford* v. *County of Sacramento,* 239 Cal.App.2d 791, 796 [49 Cal.Rptr. 115], the question was whether there was expert testimony in addition to rarity from which the jury could infer the probability of negligence where death resulted from a cardiac arrest in the course of administration of an anesthetic. There was no evidence pointing to the arrest resulting from the effects of the anesthesia. There was evidence the patient died from a stroke which could have been the product of an embolus or emboli breaking off from the clotted blood produced by the ankle fracture for which the patient was being treated and traveling through her body. While improper administration of drugs was testified to as a possible cause among others, in the post mortem no evidence was found either of an overdose of drugs or improper administration thereof. The court states, "In short, not a single finding of the doctor pointed to a cardiac arrest as a result of anything the anesthetist did or failed to do. On the contrary, such meager facts ascertained relative to the unsolved problem of this woman's death pointed away from any fault of the anesthetist."

In *Silverson* v. *Weber,* 57 Cal.2d 834 [22 Cal.Rptr. 337, 372 P.2d 97], plaintiff suffered a fistula after a hysterectomy. The medical testimony was to the effect doctors could not ordinarily determine the cause of a fistula, nor could they in that case. It may occur though proper care is used. The development of a fistula is rare, although an inherent risk of the operation. Numerous possible causes were given, but the court states there was nothing to indicate if it was caused by any of the causes, or a combination of them, or that it was the result of negligence. The court said, "Since it

cannot be said that the development of the fistula was more probably than not the result of negligence of the defendants, the trial court correctly concluded that the doctrine of res ipsa loquitur was not applicable." *Silverson* v. *Weber, supra,* at p. 839.

Defendants contend that there is no evidence that appellant's injuries were the proximate result of the administration of the myelogram. As to this, no medical testimony was required (*Dean* v. *Dyer,* 64 Cal.App.2d 646 [149 P.2d 288]), and the question of proximate cause is for the jury in a malpractice case as in any other case.[3]

■ The following evidence was sufficient to require the issue of proximate cause to be submitted to the jury: (1) Immediately before the myelogram was performed, appellant did not have the injury, and he did have it immediately afterward. (2) A foot drop condition results from compression or irritation of a nerve existing in the area where the needle was inserted. (3) Compression of the nerve may result from herniation of the disc at the intervertebral space where the nerve emerges. (4) The disc can be herniated by a rupture of the annulus fibrosis surrounding it, and such rupture can occur through the annulus fibrosis being struck by a needle. (5) Although there are other conditions which could also result in a compression of this nerve or its irritation (growth of a spur, diabetes, etc.), they are of a nature which develop over a period of time, and no symptom of nerve compression or irritation was found in the neurological examination by Dr. Anderson made only two days before the myelogram, and no such symptoms were observed by appellant.

■ The question of the propriety of the nonsuit in the case against Dr. Anderson depends upon whether he obtained the informed consent of appellant for the myelogram. It involves the duty of a doctor to properly explain the contemplated procedure and the question whether the patient reasonably comprehended the explanation. If appellant did not give his informed or knowledgeable consent, the performance of the myelogram would constitute a technical battery (*Pedesky* v. *Bleiberg,* 251 Cal.App.2d 119 [59 Cal.Rptr. 294]) for which the defendant would be liable for all damages proximately resulting, whether the myelogram was or was not skillfully performed. (*Pedesky* v. *Bleiberg, supra*) and whether they could be anticipated or not (*Valdez* v. *Percy,* 35 Cal.App.2d 485 [96 P.2d 142]).

■ "A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an

---

[3]Certain cases purport to state a general rule excluding opinion evidence on ultimate issues, but more recent cases hold it is not objectionable merely because it embraces the ultimate issue. *LeMere* v. *Goren,* 233 Cal.App.2d 799, 806 [43 Cal.Rptr. 898].

intelligent consent by the patient to the proposed treatment. ■ Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. ■ At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent." *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560, 578 [317 P.2d 170].

■ Dr. Anderson did not contend that he explained the nature of a myelogram to appellant. Accepting appellant's statement as to what transpired immediately before the myelogram was ordered, as we must, the jury could have found that Dr. Anderson gave the appellant no information which would give him any conception of the procedure; in fact, that the information given would have a tendency to mislead the appellant in making his decision. ■ The relationship between a physician and his patient is fiduciary, which, like all such relationships, imposes a duty of full disclosure. *Bowman* v. *McPheeters,* 77 Cal.App.2d 795, 800 [176 P.2d 745]. ■ If appellant was simply told a myelogram was nothing to worry about and that the most uncomfortable thing about it was being tilted about on a cold table, the jury could have concluded that under the facts the statement was actually deceptive. The procedure as outlined by the doctors obviously entailed much more, both as to comfort and risk. Appellant asked Dr. Anderson, "what is a myelogram; is it like the electromyograms that I have been having?" The jury could have found that this called for more than a few mollifying words which grossly understated the seriousness of the procedure.

Dr. Anderson contends appellant's testimony in his deposition shows that he was willing to consent to anything which would help his condition. He was asked what Dr. Anderson told him would be done.

"A. The myelogram. I didn't know what a myelogram was, just something exploratory to find out the trouble, and the way I felt, anything that they were going to do to help me was okay."

The statement is subject to the interpretation that the "anything" appellant had in mind was something far less drastic than a myelogram.

Certain matters were brought out at the trial concerning appellant's previous mental and emotional condition. It does not appear that these matters were known to Dr. Anderson at the time the myelogram was ordered, or, if known, entered into his determination as to what information should be given appellant. Assuming, arguendo, that such matters could be considered on a motion for a nonsuit, there is no merit in respondent Anderson's contention they could be considered under the circumstances.

Respondent Anderson further contends that there must be some showing of the requirement in the community that the patient be advised that some rare and remote result may occur from the procedure followed, citing *Tangora* v. *Matanky,* 231 Cal.App.2d 468 [42 Cal.Rptr. 348]. He has oversimplified the situation. The question is much broader; not whether he should have informed appellant he might incur a foot drop from the myelogram, but whether the doctor gave him sufficient information as to the nature of a myelogram so that he could intelligently decide whether he wished to have it. If he did not, Dr. Anderson would be liable for all injury appellant sustained in the course of the myelogram, whether the result of negligence or not.

It was held in *Tangora* that it was not error to refuse to give an instruction on informed consent where there was no evidence that the standard practice in the community required a doctor, before giving a patient an injection of penicillin, to advise him that in rare instances anaphylactic shock may occur and result in death. This case is cited in *Dunlap* v. *Marine,* 242 Cal.App.2d 162, 171 [51 Cal.Rptr. 158], as holding that the question of informed consent turns upon the issue of whether the physician was acting in conformity with recognized practices in the community.

We cannot agree that the matter of informed consent must be determined on the basis of medical testimony any more than that expert testimony of the standard practice is determinative in any other case involving a fiduciary relationship. We agree with appellant that a physician's duty to disclose is not governed by the standard practice of the physicians' community, but is a duty imposed by law which governs his conduct in the same manner as others in a similar fiduciary realtionship. To hold otherwise would permit the medical profession to determine its own responsibilities to the patients in a matter of considerable public interest.

 Further, even if the question of disclosure involves expert testimony as to the standard practice, such testimony is present in the

record. Dr. Faeth testified that it was not standard practice in obtaining a patient's consent to a myelogram not to inform him that it involves a spinal puncture and injecting opaque fluid in the spinal canal.

The judgment is reversed.

Stephens, Acting P. J., and Reppy, J., concurred.

A petition for a rehearing was denied December 11, 1969, and respondents' petition for a hearing by the Supreme Court was denied January 14, 1970.