[No. D040023. Fourth Dist., Div. One. Apr. 18, 2003.]

JEFFREY CONTE, Plaintiff and Appellant, v.
GIRARD ORTHOPAEDIC SURGEONS MEDICAL GROUP, INC., et al.,
Defendants and Respondents.

## COUNSEL

Stephen G. Root for Plaintiff and Appellant.

Neil, Dymott, Perkins, Brown & Frank, Michael I. Neil, Clark R. Hudson and David P. Burke for Defendants and Respondents.

## OPINION

**KREMER, P. J.**—Plaintiff Jeffrey Conte appeals a judgment after jury trial favoring defendants Girard Orthopaedic Surgeons Medical Group, Inc., and Michael P. Kimball, M.D. (together Girard), on his complaint for medical battery and medical malpractice. Conte contends the trial court erred in granting a nonsuit on his medical battery cause of action.[1] We affirm the judgment.

### FACTS

We present the evidence in the light most favorable to Conte.

On August 11, 1999, Conte, then 27 years old, injured his right shoulder in a motorcross bike accident. The pain was excruciating and he could not move his right arm. Conte went to his primary care physician the next day,

---

[1] Conte's appeal challenges only the ruling on his medical battery cause of action. He does not attack the jury's defense verdict on the medical malpractice cause of action.

but X-rays did not identify any fractures. Conte continued to experience pain and limited range of motion, and he was referred to Dr. Hans Anderson at the Girard medical group. Anderson saw Conte on August 24 and ordered an MRI of the shoulder.

Because Conte and his girlfriend, Cindy May, worked at Scripps Memorial Hospital Encinitas, Conte was able to have an MRI on August 26. Radiologist Peter McCreight told Conte the MRI showed he had "a severe intraarticulated glenoid fracture" that needed immediate surgical repair.[2] A follow-up CT scan indicated Conte had a displaced glenoid fracture of four to five millimeters displacement. After talking with McCreight and another radiologist who was involved in the CT scan procedure, Conte believed he needed to have his shoulder surgically repaired.

Conte saw Anderson for a follow-up visit on August 31. On the basis of the MRI and CT films, Anderson concluded Conte needed an open reduction internal fixation (ORIF).[3] Anderson referred Conte to his partner, Kimball. When he left the office, Conte believed he was going to have his shoulder repaired.

On September 1, Kimball saw Conte, who told the surgeon he was there to schedule shoulder repair surgery. Kimball went over treatment options and expressed reservations about surgery because of the length of time from injury. Kimball said he would not decide on the treatment until he reviewed the MRI and CT films.

The next day, May, Conte's girlfriend, asked Dr. Michael Skyhar, an orthopedic surgeon at Scripps Memorial Hospital Encinitas, to look at Conte's MRI and CT films and give an informal opinion. Skyhar told her: Conte needed ORIF, not arthroscopic surgery, to repair the shoulder; the fracture was four millimeters; and it was not too late for surgery. May relayed this information to Kimball during two phone conversations.

At a September 3 office visit, Kimball told Conte he recommended an arthroscopic evaluation of the injury with a possible repair via either

---

[2]In lay terms, Conte's injury was a fracture that ran across the front of the socket half of the shoulder joint. The consensus among medical professionals is repair of this type of injury is best undertaken within a few days after the injury, and as time progresses repair becomes more difficult and possibly less effective.

[3]During an ORIF, the shoulder is opened, the fracture is "reduced," which means the fragments are realigned into proper position, and the realigned fragments are "fixed" or secured in place with a device such as a biodegradable screw.

arthroscopic or open surgery if necessary. Conte pointed out that all the other doctors had recommended open rather than arthroscopic surgery. Kimball responded: "Well, I'm the doctor and I'm going to make the decisions." Kimball left the examination room, and Dr. Enass Rickards, who was to assist Kimball during surgery, came in and discussed treatment options ranging from doing nothing to surgical repair. After his discussions with Kimball and Rickards, Conte believed he was going to have his shoulder repaired.

Before he left the office, Conte read and signed a consent form with the typewritten description of the procedure: "ORIF RIGHT SCAPULAR & GLENOID."[4] The consent form also stated: "I further authorize the doctor to do any procedure that his judgment may dictate to be advisable for my well-being." Conte testified he believed he was consenting to a repair of his shoulder joint fracture and not to an arthroscopic diagnostic procedure in which the shoulder would be repaired only if the doctor thought it was indicated. Further, he would not have signed the consent form if he believed he was consenting to a diagnostic procedure with only possible repair.

On September 7, Kimball performed surgery on Conte's right shoulder at Scripps Memorial Hospital La Jolla. Kimball examined the shoulder joint arthroscopically and determined the amount of displacement from the fracture was less than the radiology reports had previously indicated. He probed the fracture with a K wire in preparation to put in a biodegradable screw, but did not proceed because he decided the screw might cause the fracture fragment to fall apart. Kimball testified: "[W]e felt at that point it was best to leave things alone" and "I didn't want to make him any worse."

Conte was astounded and upset when he learned after the operation that his shoulder had not been repaired. Conte attempted to find another doctor to perform the shoulder repair surgery, but by the time his HMO had approved an appointment with another orthopedic surgeon in late September it was too late.

---

[4]Exhibit 11, produced at trial by Kimball, contained "[with] arthroscopy" in Kimball's handwriting next to the typed "ORIF RIGHT SCAPULAR & GLENOID." Conte and May testified they specifically remembered the consent form Conte signed on September 3 did not have the handwritten addition; however, Conte could not locate his copy of exhibit 11 without the handwritten addition. Kimball said he made the alteration to the consent form before Conte signed it.

At the end of Conte's case-in-chief, Girard successfully moved for nonsuit on the medical battery cause of action.[5] Conte's medical malpractice case proceeded and went to the jury, which found Kimball was not negligent.

## DISCUSSION

A motion for nonsuit has the effect of a demurrer to the evidence: it concedes the truth of the facts presented by the plaintiff, but contends those facts are insufficient as a matter of law to establish a prima facie case. (Code Civ. Proc., § 581c; *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) In reviewing a judgment entered upon a nonsuit granted after the close of the plaintiff's case-in-chief, we review the entire record and assess the evidence in the light most favorable to the plaintiff. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1327 [96 Cal.Rptr.2d 364].) " 'Since motions for nonsuit raise issues of law [citation], we review the rulings on those motions de novo, employing the same standard which governs the trial court [citation].' " (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 43 [100 Cal.Rptr.2d 627].) " ' " ' The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " ' " (*Alpert*, at p. 1327.)

A battery is an intentional and offensive touching of a person who has not consented to the touching. (*Rains v. Superior Court* (1984) 150 Cal.App.3d 933, 938 [198 Cal.Rptr. 249]; 1 Dobbs, The Law of Torts (2001) § 28, pp. 52-53.) Although typically a battery is a violation of a person's wishes to avoid bodily contact that is hostile, aggressive or harmful, the tort is committed if there is unwanted intentional touching of any kind. (1 Dobbs, The Law of Torts, *supra*, § 29, pp. 54-55.) For example, a person is entitled to refuse well-intentioned medical treatment. (*Id.*, at p. 54 & fn. 2.) Thus, lack of consent is an essential element of battery. (*Rains*, at p. 938.) Generally, one who consents to a touching cannot recover in an action for battery. (*Ashcraft v. King* (1991) 228 Cal.App.3d 604 [278 Cal.Rptr. 900].)

It is well settled that a physician who performs a medical procedure without the patient's consent commits a battery irrespective of the skill or

---

[5]Before trial, Girard had attempted to dispose of the medical battery cause of action by demurring to Conte's second amended complaint and by moving for summary adjudication. At the time, the case was assigned to Judge Michael Anello, who overruled the demurrer and denied summary adjudication.

care used. (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 735 [21 Cal.Rptr.2d 357, 855 P.2d 375].) In the medical context, the law has developed the doctrine of informed consent, which requires a patient's consent be an informed consent to be effective and imposes a duty on the physician to provide material information about any proposed treatment, such as risks and alternative procedures. (See *Cobbs v. Grant* (1972) 8 Cal.3d 229, 239-243 [104 Cal.Rptr. 505, 502 P.2d 1]; *Berkey v. Anderson* (1969) 1 Cal.App.3d 790, 803 [82 Cal.Rptr. 67].) Under the informed consent doctrine, " ' "the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis." ' " (*Thor*, at p. 735.)

■ In *Cobbs v. Grant, supra*, 8 Cal.3d at pages 239-241, our Supreme Court explained that a doctor's failure to obtain the patient's informed consent can give rise to two different causes of action: negligence, and battery. If the patient consents to a procedure without being informed of all the known risks, the doctor's failure to disclose those risks is negligence. (*Ibid.*) "[W]hen the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation, the action should be pleaded in negligence." (*Id.* at pp. 240-241.) However, "[w]here a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery." (*Id.* at p. 239.) In such a situation, "the requisite element of deliberate intent to deviate from the consent given is present." (*Id.* at p. 240.)

A typical medical battery case is where a patient has consented to a particular treatment, but the doctor performs a treatment that goes beyond the consent. "When an action is based upon the theory of surgery beyond consent, the gist of such action is the unwarranted exceeding of the consent. This is a theory of technical battery." (*Pedesky v. Bleiberg* (1967) 251 Cal.App.2d 119, 123 [59 Cal.Rptr. 294].) For example, the patient consents to an electromyogram, a relatively uncomplicated procedure, but the doctor performs a myelogram, which involves a spinal puncture. (*Berkey v. Anderson, supra*, 1 Cal.App.3d 790.) Or, the patient consents to an operation on his right ear, but the doctor operates on the left ear. (*Mohr v. Williams* (1905) 95

Minn. 261 [104 N.W. 12], overruled on other grounds in *Genzel v. Halvorson* (1957) 248 Minn. 527 [80 N.W.2d 854, 859].)

Conte contends he presented a viable case of battery because Kimball performed a substantially different treatment—namely, surgery without repair of his shoulder—than the treatment to which he consented—namely, surgery with repair. Given the time restraints surrounding this type of shoulder surgery, Conte urges his consent was not for a strictly diagnostic procedure. In other words, Conte asserts that because he definitely wanted his shoulder fixed at that time, he consented only to a surgical repair.

Conte argues that there is no logical reason to restrict medical battery to cases in which the doctor's treatment exceeded the scope of the patient's consent. However, Conte does not point to any published authority upholding a battery cause of action based on a substantially different treatment where the doctor's touching was within the scope of the consent given by the patient.

Moreover, Conte's argument ignores basic tort principles concerning the principle of consent as a defense to intentional torts in general and specifically to battery. Consent is not a defense when the "tortious conduct . . . is outside the scope of the consent." (1 Dobbs, The Law of Torts, *supra*, § 104, p. 243.) "The scope of the defendant's protection is the scope of the consent. If his conduct would be tortious except for consent and his conduct goes beyond the consent . . . , he is subject to liability." (*Ibid.*) In the medical battery context, the scope of the consent is important because the gist of such battery is that the doctor has intentionally touched the patient without consent or in a manner that exceeds the consent and without justification. (*Pedesky v. Bleiberg, supra*, 251 Cal.App.2d at p. 123; 1 Dobbs, The Law of Torts, *supra*, § 29, p. 55.)

A doctor may not act beyond the patient's authorization except in life- or health-threatening situations. Here, Kimball did less, not more, than he was authorized to do during surgery. As the terms are used in this context, the surgery was not a substantially different treatment than the treatment to which Conte consented.

We see no policy reason to extend the law of battery to these circumstances where the treatment was within the bounds of Conte's consent. Kimball exercised his medical judgment in deciding not to install a fixation

device, concluding that such a procedure would make the brittle bone disintegrate. If doctors were subject to liability for battery in such situations, it would deter them from freely exercising their medical judgment. Conte's recourse properly lay in a medical malpractice action, not a medical battery cause of action.

Nor could Conte have prevailed under a battery theory of conditional consent. (See *Ashcraft v. King, supra,* 228 Cal.App.3d 604; *Grieves v. Superior Court* (1984) 157 Cal.App.3d 159, 165 [203 Cal.Rptr. 556] [consent to tubal ligation only if baby born without deformities].) In *Ashcraft, supra,* at page 610, the Court of Appeal held a patient may place conditions on the doctor's authority to perform an operation, and the doctor who violates the conditions may be liable for battery. Consent was given for surgery to correct a curvature of the spine of a 16-year-old girl, but the consent was expressly conditioned on the use of only family-donated blood for necessary transfusions. (*Id.* at pp. 608-609.) The surgeon ignored the condition and used blood from the general supplies on hand at the hospital, some of which came from an HIV-positive donor. (*Id.* at p. 609.) Subsequently, the girl became HIV positive. (*Ibid.*)

There are three elements to a claim for medical battery under a violation of conditional consent: the patient must show his consent was conditional; the doctor intentionally violated the condition while providing treatment; and the patient suffered harm as a result of the doctor's violation of the condition. (*Ashcraft v. King, supra,* 228 Cal.App.3d at p. 611.) Those elements were not met here. There was no evidence of an express condition; Conte did not explicitly say his surgery must include a mechanical fixation of his fracture.

Moreover, assuming that Conte clearly informed Kimball he was consenting only to surgery *with* repair, such an intangible condition is unlike the specific condition set forth in *Ashcraft v. King, supra,* 228 Cal.App.3d 604, and other conditional consent cases. (See, e.g., *Keister v. O'Neil* (1943) 59 Cal.App.2d 428, 434-435 [138 P.2d 723] [operation consented to but " 'absolutely did not want . . . a spinal anesthetic' "]; *Clark v. Miller* (Minn.Ct.App. 1986) 378 N.W.2d 838, 847 [surgical procedure authorized only if doctor discovered arthritis or malalignment]; *Chambers v. Nottebaum* (Fla.Dist.Ct.App. 1957) 96 So.2d 716, 717 [operation consented to but patient "would not permit a spinal anesthetic"]; *Rolater v. Strain* (1913) 1913 Okla. 634 [137 P. 96, 97] [patient consented to operation upon "express condition that no bone should be removed from her foot"].)

## DISPOSITION

Affirmed. Respondents to recover costs on appeal.

Benke, J., and McDonald, J., concurred.